## Case No. 9,910.

### The MULHOUSE.

[22 Law Rep. 276; 42 Hunt, Mer. Mag. 191.] [1]

District Court. S. D. Florida. 1859.

SALVAGE — APPORTIONMENT BETWEEN CARGO, FREIGHT, AND VESSEL—DESTRUCTION OF VESSEL—CARE OF PROPERTY SAVED—EMBEZZLEMENT — NEGLIGENCE — INNOCENT OWNER OF SALVOR VESSEL—SAVING LIFE.

1. Where a ship and cargo, accidentally stranded, are saved by lightening the ship, by carrying out anchors, or by other common or continuous labor or service, carried on with a view to the saving of both ship and cargo, the salvage expenses are properly to be apportioned upon the ship, freight, and cargo, in proportion to their respective values, as in a case of general average.

2. But where the ship is lost, and the voyage broken up, no such rule obtains; but each article of the cargo is charged with its own particular expenses of saving. The interests of the parties are sundered by the destruction of the ship, and the maxim "Sauve qui peut" applies.

[3] [From 11 O. G. 741.]

[1] [42 Hunt. Mer. Mag. 191, contains only a partial report.]

3. By the maritime law, salvors are bound to exercise the same degree of diligence in keeping the property in their custody, that a prudent man ordinarily exercises in keeping his own property.

4. Embezzlement, or a fraudulent concealment, of any of the goods saved, works a forfeiture of the salvage of the guilty party.

5. Slight negligence in taking care of the property saved, diminishes the amount of salvage; gross negligence works a total denial or forfeiture of salvage, in the same manner as embezzlement.

6. Salvors are bound to use every reasonable degree of diligence to prevent plunderage by others.

7. The owner of a salvor vessel, himself being innocent, is entitled to compensation for the use of his vessel where a valuable salvage-service has been rendered, notwithstanding the negligence or misconduct of the crew.

8. The master and crew of a transient or trading vessel, which in the course of her voyage accidentally falls in with a vessel in distress or abandoned, and renders salvage-services, are not, while performing such services, acting within, but beyond, the scope of their employment, as the agents or servants of the owner. Consequently, he is not liable for loss or damage caused by their misfeasance or nonfeasance while thus employed.

9. But the master and crew of a vessel employed in the business of performing salvage services, as that business is conducted on the southern coast of Florida, are to be considered as the agents and servants of the owner, while engaged in such business. He is consequently, liable for loss or damage caused by their torts, frauds, collusions, negligences or ignorance in saving, preserving, or accounting for the property, or in any other matter within the scope of their employment.

10. Salvage for saving life, unconnected with the saving of property, is not allowed, except for saving the life of a slave.

11. If life is saved in connection with property, it is proper for the court, reasonably to enhance the salvage on that account.

12. If, in a case of shipwreck, one set of salvors saves life, but no property, and another saves property, each should be compensated out of the property saved, according to the merit of its services.

13. The sum allowed for saving life is in the nature of a general salvage charge upon all the property saved.

14. There is no implied obligation on the part of the owner of a transient or trading vessel, which in the course of her voyage, accidentally falls in with a vessel in distress or abandoned, and renders salvage assistance, that his vessel is seaworthy, or fit for that service. He is therefore entitled to salvage for the service rendered, notwithstanding the unseaworthiness of his vessel, and, is not liable for loss or damage caused by such unseaworthiness, there being no fraudulent misrepresentation, or concealment, on his part, as to its condition.

15. But there is an implied undertaking on the part of the owner of a vessel employed on the coast of Florida, in the business of saving shipwrecked property, that his vessel is seaworthy, and fit for the business she is engaged in. He is therefore liable for loss or damage caused by the leaky condition of his vessel; and is also liable to have his salvage diminished or forfeited, on account of his neglect to keep his vessel in good condition.

16. Salvage claimed for saving passengers, and refused to the owner of the wrecking vessel, on account of its leaky condition. Refused to the crew, on account of their being in such a state of intoxication as to be unfit for service, at a time when their services were needed. Fifty dollars allowed to the master, and twenty to the cook, of a wrecking vessel for saving the lives of twenty-six passengers.

17. The officers and crews of public vessels are entitled to salvage for their personal services, in the same manner as other persons. But as they risk no property, and their time is paid for by the public, they ought to be satisfied with a less rate of compensation than would be allowed to other persons for like services.

18. One hundred dollars allowed for saving the crew of the ship.

19. In a case of shipwreck and total loss of the ship, the court allowed salvage as follows: 5 per cent. for saving specie. 25 per cent. for saving dry dock cotton. 45 per cent. for saving cotton submerged under water, between decks; and 55 per cent. for saving cotton out of the lower hold, by diving in from eight to sixteen feet of water. Shares forfeited for negligence.
[Cited in Pent v. The Ocean Belle, Case No. 10,961.]

This suit was instituted by several distinct sets of salvors, numbering in all some one hundred and fifty or more persons, to recover salvage for their services in saving a considerable portion of the cargo and materials of the ship Mulhouse, Wilner, master, of and from New Orleans, and bound to Havre in France. The ship sailed from New Orleans laden with 2689 bales of cotton, and $25,500 in silver coin, and on the 26th day of March last stranded upon that part of the Florida reef known as the "Quick Sands," an exposed reef situated out of sight of land, and about thirty miles to the westward of this port. Before assistance could be obtained, the ship bilged, filled with water, and, a day or two after, drove into deeper water, heeled over and sunk so low in the water as to submerge her upper hatches, leaving her upper rail and bulwark, as she lay careened, out of water; all the rest of the ship was under water. The libellants and petitioners saved from the wreck,—the crew, twenty-six passengers, the money, and 2,102 bales of cotton. The more particular facts of the case are sufficiently stated in the opinion of the court, which we are obliged somewhat to condense.

Winer Bethel, for libellants.

J. L. Tatum and W. C. Maloney, for certain petitioners.

S. J. Douglas, for claimant and respondent.

MARVIN, District Judge. Where a ship and cargo, accidentally stranded, are saved by lightening the ship by carrying out anchors, or by other common or continuous labor or service, carried on with a view to the saving of both ship and cargo, the salvage expenses are properly to be apportioned upon the ship, freight and cargo, in proportion to their respective values, as in a case of general average. Moran v. Jones, 7 El. & Bl. 523; Bedford Ins. Co. v. Parker, 2 Pick. 1; 11 Pick. 90; Beran v. Bank of U. S., 4

Whart. 301; The Emma, 2 W. Rob. Adm. 315; Nelson v. Belmont, 5 Duer, 310. In this class of cases, each article of the cargo—whether it be of great value and little bulk, and so easily saved, as money or jewelry, or of great bulk and little value, as coal or lumber, and so saved with difficulty—is charged with the same rate of salvage as the ship or freight, or any other article of the cargo. Beran v. Bank of U. S., 4 Whart. 301; Abb. Shipp. pt. 4, c. 10, § 12 et seq. For the interests of all the parties being connected in a common enterprise, and in the service being a common or continuous service carried on for the common benefit, the law considers that the parties are benefited by the service in equal proportions, and that, therefore, they ought to be charged with equal proportions of the expense,—"Qui sentit commodum sentire debit et onus." But where, as in the present case, the ship is lost, and the voyage broken up, no such rule obtains, but each article of the cargo or invoice is to be charged with its own particular expenses of saving. The interests of the parties are sundered by the destruction of the ship, and the maxim "Sauve qui peut,"—"Save who can,"—applies. It is like the case of a fire, on land, where each person saves his own goods at his own proper charge, and without any connection with his neighbor. The Samuel, 15 Jur. 407; s. c., 4 Eng. Law & Eq. 581; Bridge v. Niagara Ins. Co., 1 Hall, 468; Emerigon, tom. 1, p. 612; Perkins' Abb. Shipp, pt. 4, c. 10, § 4, in notis; Marv. Wr. & Salv. §§ 164–167. In the present case, the ship being a general ship and accidentally lost, and the voyage broken up, it becomes the duty of the court to discriminate between the different articles saved, and to shape its decree in such a manner that each article shall be charged with its own separate salvage, determined in amount according to the labor expended and risk encountered in saving it, notwithstanding the fact that the master, as the common agent of all the shippers, claims the whole cargo by a single conjoint claim.

The sloop Beckwith, Parke, master, was one of the first vessels at the wreck. When the sloop arrived, there were six or seven feet of water in the ship's hold. More men and vessels were deemed necessary to save the ship and cargo. Captain Wilner, accordingly, determined to load the sloop, and proceed without delay to Key West for further assistance. He put on board the sloop sixty-seven bales of cotton, and five kegs, containing $25,500 in silver coin, and proceeded in the sloop to this port. Arrived at anchor in the harbor, at about ten o'clock at night, his business required him to go on shore and the master of the sloop and two of her crew took him in their boat and landed him. The master of the sloop went to his house, and remained there all night. The two men got intoxicated, and remained on shore several hours—precisely how long does not appear.

Two men were left on board the sloop. Whether they continued awake or went to sleep does not appear. Between two and three o'clock in the night, some men from the shore went on board the sloop and stole one of the kegs containing $5,000. Before, however, they had succeeded in getting it on shore, Baker, Roberts, and Preston, three fishermen, who had risen early in the morning, in order to market their fish, missed their boat; and, while looking for it, they discovered a boat coming towards the shore, with three men in it. They hailed the men, and challenged the boat as theirs. They soon heard a plunge in the water, near where the boat then was, and thought one of the men had fallen overboard. The three men, however, landed on the wharf, and disappeared, without being recognized, in the dim starlight. About seven or eight o'clock in the morning, the fishermen, hearing of the loss of the money, suspected that the men who had taken their boat so unceremoniously, had taken the money also; and they thought it likely that the money might be found at the place whence proceeded the sound of the plunge. Acting on this idea, they soon realized the truth of their conjectures, and found the money sunk in seven or eight feet of water. They restored it to the captain of the ship. They claim compensation in the nature of salvage for this service.

Now, it is very plain, upon the foregoing statement of facts, that Parke, master and part-owner of the sloop, both as master and part-owner; Rand, mate; Noyes and Robinson, seamen; composing the whole crew who came up in the sloop from the wreck, and upon whom the duty of watching and taking care of the goods committed to their keeping was devolved, have forfeited their shares of the salvage, both upon the money and upon the cotton, on account of their neglect to take proper care of the money. Their duty was obvious. They were each and every of them, bound to take the same kind of care, and exercise the same degree of diligence in keeping the property placed in their custody, that a prudent man ordinarily takes and exercises in keeping his own property. Tested by this rule, it is plain that they were guilty, not of ordinary neglect merely, but of gross negligence—so gross, that it produces a suspicion that they were in collusion with the thieves. But it is not necessary to accuse them of larceny or embezzlement. Their shares are as much liable to forfeiture for so gross a neglect of duty, as for embezzlement or larceny. "The maritime law," says Justice Story, "demands most emphatically from salvors, scrupulous good faith and uprightness of conduct—giving them a liberal reward for fidelity and vigilance, and visiting them with severe reprobation and diminished compensation for every negligence." The Boston [Case No. 1,673]. "Salvors," says Judge Ware, "are not only bound to scrupulous honesty themselves, but while the prop-

erty is in their custody, they are jointly required to employ every reasonable degree of diligence to prevent it from plunderage by others. Any negligence in this respect if not visited with an entire forfeiture of salvage, will be remembered in fixing the amount." The John Perkins [Id. 7,360]. The supreme court, in the case of The Blaireau, 2 Cranch [6 U. S.] 240, reduced the share of the mate to that of a common seaman, because he had neglected to use due diligence to prevent pilfering from the cargo saved. To encourage good conduct, the maritime law, on grounds of policy, compensates the services of a meritorious salvor, where the amount of property saved is large, with a reward,—a gratuity,—something over and above a quantum meruit for ordinary work and labor. On the same grounds of policy, it diminishes, denies or forfeits the reward, according to the demerit of the salvor. The Blaireau, 2 Cranch [6 U. S.] 240. The reason for this diminution or forfeiture is, not so much that the owner of the property saved may in this way, be indemnified, in whole or in part, for the loss or damage caused by the misconduct, though this is by no means overlooked, as that the misconduct impairs or destroys the merit of the delinquent and renders him unworthy of its reward. Accordingly, the extent of the diminution or forfeiture is measured, not so much by the amount of the loss or damage sustained by the owner of the property saved, as by the moral quality or degree of turpitude of the act complained of. The Cape Packet, 3 W. Rob. Adm. 122. Embezzlement or concealment of a penny's worth of the goods saved, works a forfeiture of the guilty party's share of the salvage, however large it may be (The Blaireau, 2 Cranch [6 U. S.] 240; The Bello Corrunes, 6 Wheat. [19 U. S.] 152; The Boston [supra]), though, at the same time his sincere repentance and tender of amends, will operate as a condonation of the offence, and restore him to his original rights. Laws of Oleron, art. 13; The Rising Sun [Case No. 11,858]; Perkins' Abb. Shipp. pt. 5, c. 3, § 4, in notis. In the present case, gross neglect—a serious offence—works a forfeiture of an amount of salvage exceeding any loss the owner of the money has sustained. In The Glory, 14 Jur. 676; s. c., 2 Eng. Law & Eq. 554, Dr. Lushington diminished the salvage two-thirds on account of the misconduct of the salvors, in preventing the employment of a steam-tug, though no loss or damage accrued to the owner of the property saved, on account of such misconduct. In The Cape Packet, 3 W. Rob. Adm. 122, he diminished the salvage, but how much does not appear from the report, on account of an error of judgment or slight carelessness of the salvors, by reason of which the vessel was got ashore a second time; and in The Duke of Manchester, 2 W. Rob. Adm. 470, he refused all salvage, on account of the vessel having been got aground a second time through gross negligence.

It is contended that the share of Shafer, the other part-owner of the Beckwith, ought, also, to be forfeited, not on the ground of any fault on his part, but on the ground of his legal liability for the faults of his crew. Admitting, for the present, that the owner of a wrecking vessel, like the owner of any other vessel, is liable to third persons for loss or damage caused by the negligence of his crew, yet it does not follow that in addition to this he is also, in such cases, to be denied all compensation for the use of his vessel. It is difficult to extract from the reported cases, any general rule on this subject. I think, however, that none of the cases conflict with the idea, that whenever a valuable salvage service has been performed by the master and crew—a real benefit done to the owners of the property saved—the owner of the salvor vessel, being innocent, is entitled, in equity and good conscience, to be remunerated for the use of his vessel, according to the actual service rendered and benefit conferred, notwithstanding any neglect or misconduct of the master or crew, working a forfeiture of their shares. His claim to salvage is founded on the equity of compensating him for the use of his vessel, when the owner of the property saved has been benefited thereby. It is not the use of the vessel alone that entitles him to be considered as a salvor, but its use producing a benefit to the owner of the property saved—making it thereby equitable that the latter should pay the former a reasonable compensation. Embezzlement of a part of the goods saved by the salvor crew does not work a forfeiture or diminution of the shares of the owner of the salvor vessel, without any fault on his part; for, notwithstanding such embezzlement, a real and substantial salvage service may have been and ordinarily has been rendered, for which it is just that he, being innocent, should be compensated. The Rising Sun [supra]; The Blaireau, 2 Cranch [6 U. S.] 240; The Boston [supra]. The decisions in the cases of The Duke of Manchester, 2 W. Rob. Adm. 470, The Cape Packet, 3 W. Rob. Adm. 122, and a few others of a similar character, in which the salvage was either wholly withheld or diminished in amount, both as to the owner and crew, on account of the misconduct of the latter, seem at first sight to be at variance with the rule as above stated. But upon a more careful consideration of these cases, I think this apparent conflict disappears. In the cases named, the salvors, through carelessness and negligence, got the vessels ashore a second time. Damage was incurred thereby, and further assistance was made necessary. Considering these facts, and taking into account the chances that the vessels might, possibly, have been relieved by their own masters and crews, had no assistance been offered, or that other persons, more careful, might have become the salvors, it becomes doubtful whether the owners of the property were really benefited at all, or

more than a very little by the supposed salvage-services. If the consequences of the fraud, negligence, or carelessness, or ignorance, of the salvor crew, so immediately connect themselves with the rendition of the services, that the value of the latter is thereby greatly diminished or destroyed, little or no benefit is done the owner of the property saved by their services, little or no salvage is earned, and consequently, the owner of the salvor vessel is entitled to little or no compensation for the use of his vessel. But if, on the other hand, a truly valuable salvage service has been rendered, no misconduct of the master or crew ought to deprive the owner of a just reward for the use of his vessel.

In the present case, a real and valuable salvage-service has been performed by the master and crew of the Beckwith. Shafer, the part-owner, is innocent of any participation in their misconduct, either by concurrent connivance or subsequent acquiescence. Immediately on being informed of the loss of the money, he took vigorous measures to recover it, and to detect and punish the thieves. It is true the money was not recovered by means of his exertions; but he did what was his duty to do in the matter. I think that his share of the salvage ought not to be forfeited or withheld, but that he ought to recover a reasonable compensation for the use of his vessel. The men of the sloop's crew who remained behind at the wreck, at work, are, of course, innocent of any participation in the negligence here imputed to the others, and are entitled to their full shares of the salvage.

But it is argued, that whether the shares of Shafer should be forfeited or not, he is, at least, bound to make good the loss or damage occasioned by the larceny of the money; that is to say, to pay the sum which may be awarded to the three fishermen for finding and restoring it. Salvors are not common carriers; and if he is liable at all, it must be upon the ground that the owner of a vessel employed in the business of wrecking, is liable for damage caused by the misfeasance or nonfeasance of the master and crew, acting within the scope of their employment. It is a general doctrine of law, that the principal is held liable to third persons, in a civil suit, for the frauds, deceits, concealments, misrepresentations, torts, negligence, and other malfeasances, or misfeasances and omissions of duty, of his agent in the course of his employment, although the principal did not authorize, or justify, or participate in, or, indeed, know of such misconduct, or even if he forbade the acts, or disapproved of them. Story, Ag. § 452, and cases there cited. This doctrine obtains in the maritime as well as in the common and civil law. By the maritime law, the owner of a ship is considered as the principal, and the master and crew as his servants or agents. He is, consequently, held liable for damages or losses sustained by the shipper of goods, or other third person, caused by their fraud, negligence, unskillfulness, or tortious act, in the course of their employment. Chamberlain v. Ward, 21 How. [62 U. S.] 548; The Druid, 1 W. Rob. Adm. 391; Stone v. Ketland [Case No. 13,483]; Abb. Shipp. pt. 2, c. 4, § 1; Id. pt. 3, c. 1, § 1; Id. pt. 4, c. 5, § 3; Id. pt. 4. c. 6, § 1. Admitting the law to be so in ordinary cases of merchant or trading vessels, yet, nevertheless, it is argued that the maritime law does not impose so rigorous and so exact a responsibility on the owners of wrecking vessels; that they are not common carriers; are not bound by any charter-party, bill of lading, or other express contract; but are salvors; and that no decision has ever yet been made declaring the owner of a salvor vessel, as such and without an express contract, to be responsible for losses or damages caused by the fraud, negligence, or tortious acts of the salvor crew. It is admitted that within our knowledge, no such decision has been made. But the question now before the court for its decision, is not a general one; it is not whether the owner of every kind of salvor vessel is thus liable, but whether the owner of a particular kind of vessel—a vessel employed in the business of rendering salvage-services as a business,—is thus liable. It is obvious that this question could only arise in districts where wrecking is carried on as a business, as it is on this coast, and among the Bahama Islands. It has never been distinctly presented to this court for its decision, before the present time; and I am not aware that it has ever arisen in the vice-admiralty court of the Bahamas.

There is a plain difference between the nature and extent of the liability of an owner of a trading vessel, which in the course of a voyage accidentally falls in with another vessel, abandoned or in distress, and renders salvage-services, and the nature and extent of the liability of an owner of a vessel employed in the business of rendering salvage-services, as a business. In the case of a trading vessel, the master and crew are not acting within the scope of their employment while engaged in rendering such services, and consequently are not, quoad hoc, the servants or agents of the owner. Their employment is, to navigate their vessel and complete their voyage. And, although, they are permitted, in the master's discretion, to engage in a salvage enterprise which may present itself in the course of their voyage, yet such enterprise is wholly beyond and outside of the range of their employment, and not in the contemplation of the owner or themselves at the time of their engagement. Consequently, the owner is not liable for their misfeasances, or nonfeasances while engaged in such enterprise. But in the case of a vessel employed in the business of rendering salvage-services as a business, the performance of such services, the accomplishment of such enterprise, is the very object for which the master and crew are engaged by the owner. As this busi-

ness is conducted on this coast, the owner furnishes and supplies the vessel, and appoints and removes the master, and through him, the crew. The salvages earned are divided among them into shares—the owner drawing one-half, the master and crew the other half. It is a regular business—a steady employment. But it is argued that inasmuch as according to this arrangement the owner does not pay the crew wages, and they work for themselves as well as for him, they are not his servants or agents, but are acting in their own right and upon their own independent responsibility. But I think it too plain for argument, that the payment of wages is not at all essential to the relation of master and servant. This relation grows out of the fact of the employment, independent of the mode of payment. The case is analogous to that of a privateer. The owner of a privateer, in time of war, fits out and supplies the vessel, and engages the crew. The object of their employment is, to capture the vessels of the enemy, as prizes of war. They are paid no wages, but are paid in shares of prize-money. They work quite as much for themselves, and quite as much in their own rights, and on their own responsibility, as the persons on board a wrecking vessel do; yet, by the universal maritime law, they are held to be the servants and agents of the owner of the privateer; so that if, in the execution of the business of their employment, loss or damage happens to any third person by reason of their torts, trespass, negligence, fraud, ignorance, or want of proper skill, the owner of the privateer is held liable. The Amiable Nancy [Case No. 331]; s. c., 3 Wheat. [16 U. S.] 546; The Nostra Signora de los Dolores, 1 Dod. 290; The Anna Maria, 2 Wheat. [15 U. S.] 327; The Die Fire Damer, 5 C. Rob. Adm. 357; The Revenge [Case No. 3,877]; Perkins' Abb. pt. 2, c. 2, § 5, in notis. The case of a fishing vessel is also analogous; the owner being held liable for the negligence of the crew, though they are paid in shares of the earnings of the voyage. The Dundee, 1 Hagg. Adm. 109. Indeed, I think it would be a strange anomaly in the law, that the owner of a vessel employed in any kind of business, should not be held liable to third persons for the misfeasance and nonfeasance of the master and crew, acting within the scope of their employment, without any regard to the terms of hiring or mode of payment. His liability in such cases, is, however, limited by a late act of congress to the value or amount of his interest in the vessel. Act March 3, 1851 [9 Stat. 635].

It follows from what has been said, that, the Beckwith being employed, at the time, in wrecking as a business, the owners would have been liable to the extent of the value of their interest in the vessel, for the loss of the money, had it not been found and restored. As it is they are liable for the actual damage, if any, caused by the larceny. But if we take into account the value of the forfeited shares (and I see no good reason why we should not) it will be seen that the owner of the money has suffered no loss by the larceny; but on the contrary, he has been gainer. The value of the forfeited shares, to be restored to the owner of the money, has been ascertained to be $605.62, and the sum intended to be allowed the three fishermen, for finding and restoring the money, is $250. The difference is an actual gain or saving to the owner of the money. But it is argued that he is entitled to the forfeited shares and also to the damages. However this may be as against the actual wrong-doers, I am not prepared to say that, this is true as against an innocent party. Forfeited shares are usually made to enure wholly to the benefit of the owners of the property; but not always. Sometimes they are made to enure to the benefit, in part or in whole, of co-salvors. What interest shall be benefited by the forfeiture, is a question of sound judicial discretion. So that the owner of the money is not entitled, of absolute right, to the forfeited shares. By their being decreed to him, in the present case, he is fully indemnified by the actual wrong-doers, against any loss or damage caused by their negligence. I cannot see the justice of his making a further demand upon the owner of the Beckwith, who is innocent of any blame.

The sloop Globe was among the first vessels at the wreck. She took on board and brought to this port, twenty-six passengers and their baggage, but no cargo nor materials. The schooner Tortugas brought off the ship's crew, when they became no longer of any use on board. Salvage is claimed for these services. Compensation for saving life, except the life of a slave unconnected with the saving of property, is left by the law to the voluntary bounty of individuals. The Aid, 1 Hagg. Adm. 84; The Zephyrus, 1 W. Rob. Adm. 330. Indeed, if no property is saved, no means are supplied by which the court can reward the salvor. A suit in personam, for salvage for saving the life of a free person, would be a novelty and probably could not be maintained, unless under very special circumstances, of an express contract. But if life is saved in connection with property, it is proper for the court to take notice of that fact, and increase the salvage accordingly. The Emblem [Case No. 4,434]; The Queen Mab, 3 Hagg. Adm. 242; The Aid, supra; Abb. Shipp. pt. 4, c. 12, § 5. The fact that the property has been saved by other vessels, does not deprive the Globe and Tortugas of a right to a just compensation for their services in saving the lives of the passengers and crew. If this could be so—if any advantage in the salvage could be obtained by saving the property rather than the lives—a strong temptation would be held out to salvors, in many instances, to gratify their avarice at the expense of their feelings of humanity. In cases of shipwreck, if one set of salvors saves life and another property, each is to be com-

pensated out of the property saved, according to the merit of their respective services. The Genesee Chief [12 How. (53 U. S.) 443]. As to the right to compensation it can make no difference, in principle, whether the set of salvors who saves life, saves property also or not; for the sum allowed for saving life, ought not to be charged wholly upon the particular goods. if any, that may happen to have been saved by the same salvors in immediate connection with the saving of life, but upon all the goods saved from the wreck, by all the different salvors, in proportion to their value. It is, in such cases, in the nature of a general-average charge.

As regards the demand of the Globe, the proof shows that she was in a leaky and unseaworthy condition at the time the service was rendered, and that the crew, except the master and cook. were unfit for duty, on account of their being in a state of intoxication. The passengers were obliged to keep the pump going, nearly or quite all the time, to prevent the vessel's sinking. Under these circumstances it may well be doubted whether reciprocal services were not performed—whether the passengers did not in fact, save the Globe, quite as much as the Globe saved the passengers. But, be this as it may, the owners of the Globe are not entitled to compensation for this service. on account of the unseaworthy condition of the vessel. In considering this point, it is necessary to revert to the distinction before noticed, between the liability of a transient or trading vessel, performing salvage-services in the course of its voyage, and the liability of the owner of a wrecking vessel employed in the business of rendering salvage-services. In the case of the transient or trading vessel, there is no implied understanding or obligation on the part of the owner, that his vessel is seaworthy or fit for the service. Wrecking is not his business. Yet, his vessel may be the only one which can be had to render the assistance required. Its employment may be the best or only thing that can be done. If, therefore, in the absence of a better vessel. and without misrepresentation or concealment, as to its condition, his vessel renders beneficial services, he ought to be compensated. Nor ought he to be held liable for damage to the goods saved caused by the leaky condition of his vessel, without any fraud or negligence on his part. But in the case of a vessel employed in the business of performing salvage-services, there is an implied undertaking on the part of the owner, that his vessel is seaworthy, and fit for the business she is engaged in. It was accordingly held by this court, in the case of the bark Pacific [Case No. 10,642], that the owner of a vessel employed in the business of wrecking was liable for damage happening to goods, taken on board from a wreck, caused by the leaky condition of his vessel. Indeed, he has no right, legal or moral. to engage in this business with an unseaworthy vessel.

It is an act of recklessness and carelessness. wholly inconsistent with that good faith and meritorious conduct which entitle the salvor to a reward. The act of congress, too, requires the vessel to be seaworthy, before it can be licensed to engage in the wrecking business. The passengers concur in saying. that the master and Cook of the Globe were sober, and energetic in the discharge of their duties. I think it proper therefore, to allow the master, who had been but recently appointed, and who knew nothing of the unseaworthiness of the vessel, fifty dollars for his services in saving the passengers, and for his polite and kind attentions to them. And I allow the cook twenty dollars. Salvage to the rest of the crew must be disallowed, on account of their being unfit for duty, in consequence of their being drunk.

Touching the services rendered ; by the schooner Tortugas, in bringing the ship's crew to the port, it is to be remarked that this vessel was. at the time, a transport vessel belonging to the United States. This fact, however, does not deprive the master and crew of a right to a just compensation for their services, though it does diminish the amount below what would, ordinarily, be allowed for similar services performed by a trading or wrecking vessel. For, as they risked no property of their own, and their time was paid for by the public, a less sum than would be allowed other persons not so situated. for similar services, would be a reasonable compensation. They are entitled to no advantage from the use of the vessel. but the benefit of its use enures solely to the owners of the property saved. They are paid for their own personal services only. The Mary Ann, 1 Hagg. Adm. 158; The Wilsons, 1 W. Rob. Adm. 172; Robson v. The Huntress [Case No. 11,971]; The Amistad, 15 Pet. [40 U. S.] 518. Under the circumstances, I think one hundred dollars divided between the master and crew, is a reasonable salvage.