[PHILADELPHIA, FEBRUARY 16TH, 1839.]

## BEVAN and Others *against* THE BANK OF THE UNITED STATES.

A vessel bound to Philadelphia, and having a large sum of specie on board belonging to the defendants, arrived in the bay of the Delaware in the month of December, and after encountering various difficulties, was stranded and ice bound, near Reedy Island, in a situation of imminent peril. The specie was carried over the ice to the shore and by land to Philadelphia, where it was delivered to the defendants. Some weeks afterwards the vessel reached Philadelphia in safety, with the remainder of the cargo, which had been in whole or in part discharged into lighters, and afterwards reshipped. *Held*, that the defendants were liable to contribute to the charges and expenses incurred after the landing of the specie, as general average.

THIS was an action of assumpsit, brought by Matthew L. Bevan, May Humphreys, James Lefever, and Christopher Vandyke, against the President Directors and Company of the Bank of the United States.

The plaintiffs were the owners of a ship called the Edward Bonaffe, which sailed in November, 1831, on a voyage from New Orleans to Philadelphia. The defendants were the owners of the sum of $90,000 in specie, shipped on board of this vessel. The action was brought to recover the sum of $1178 75, with interest, alleged to be the proportion which the owners of the specie were bound to contribute towards certain charges alleged to be general average charges, which arose under the following circumstances.

The vessel arrived in the Delaware Bay in the beginning of December, 1831; and after encountering various difficulties, became stranded and ice bound near Reedy Island, in a situation of imminent peril. It was necessary to remove her cargo as in the case of a wreck.

Among the first articles landed was the specie in question. It was received on the ice in sleds, in the morning of the 16th of December, 1831, and immediately conveyed to the shore. It was

(Bevan *v.* Bank of the United States.)

then sent to Philadelphia, and was on the following day, (the 17th,) delivered to the defendants, who afterwards paid $225, the freight stipulated by the bills of lading.

Eight weeks afterwards the vessel reached Philadelphia in safety, with the remainder of her cargo, which had been in whole or in part discharged into lighters and afterwards reshipped. During this period of eight weeks, a large number of additional charges had been incurred for the safety of the vessel and the remainder of her cargo.

A paper called an average bond, was signed by different shippers on board the Edward Bonaffe, including the defendants' cashier. It was an unsealed writing, in which the vessel was described as then lying at Reedy Island Piers, after having been aground near Port Penn, and purported, that the subscribers, owners or consignees of goods on board of her on her voyage from New Orleans to Philadelphia, agreed respectively to pay on demand, their respective proportions of any general average which might appear to be due " on account of the said voyage;" the statement to be made by J. H. Barnes, despacheur, and approved by two merchants therein named.

A statement was made by the despacheur, and approved by the two merchants.

Besides the counts for general average, *eo nomine,* the declaration contained a count for money paid, one on an account stated, and one in which the average bond and statement were relied on as constituting a submission and award.

On the trial before KENNEDY, J., at a Nisi Prius held in Philadelphia on the 11th of November, 1837, the plaintiffs produced this average bond and statement, together with the protest and vouchers which accompanied it, and were referred to in it, and a deposition of one Dulany, and here rested their case.

The defendants contended, that the plaintiff's own evidence had shown that the charges incurred down to the time of the safe landing of the specie, could not, on the most liberal view of the evidence, have exceeded two hundred and eighty dollars, of which the defendants' contributory proportion was less than two hundred and one dollars. As to this proportion of these charges, they submitted their case to such view of the evidence as the jury might deem proper.

But for the excess claimed above this sum, they denied their liability to contribution, on the ground that the specie could only be liable to contribution while it participated in the common peril with the ship, and the rest of the cargo. That as no part of these

disputed charges could be pretended to have been incidental to saving of the specie, it was not liable for contribution in respect to them, &c.

The defendants produced as a witness the despacheur who had made the statement, and who, on his examination, admitted that he had prepared it under the impression that the specie was liable to contribute to these subsequently incurred charges, in the same manner as if it had remained on board. He testified thus : " If the law be otherwise, and if it be that the specie was discharged from contribution for all charges after it was safely landed, this statement affords no guide by which to ascertain the contributory amount."

The learned judge inclined to think that the law of the case was in conformity with the views under which the despacheur had prepared the statement ; and charged the jury that the defendants were liable for the contributory amount therein reported.

The jury found a verdict in favour of the plaintiffs accordingly, for one thousand five hundred and seventy-five dollars seventy-five cents.

A rule for a new trial having been granted, the case was argued by

Mr. *Cadwalader* and Mr. *F. W. Hubbell*, in support of the rule, and by

Mr. *J. R. Ingersoll*, against it.

For the *defendants* were cited *Lord Bacon's Maxims*, § 5 ; *Ordinances of Bilbao*, § 1346 ; 2 *Magens*, 400. *Welles* v. *Boston Ins. Co.* (6 *Pickering*, 186.) *Rhodian Law* ; *Dig.* § 14 ; 3 *Campbell*, 486, per Lord KENYON ; 1 *Rolle's Abr.* 124 ; 1 *Danv.* 227 ; *Dig.* 14, 1 *Law*, 4 ; *Julius Paulus Ad. Leg. Rhod.* ; *Ord. Bilbao*, 2 *Magens*, 241 ; *Ll. Hamburg*, § 999, &c. ; *Ll. France*, § 767 ; 2 *Valin*, 209, 210 ; *Whiteridge* v. *Norris*, (6 *Mass. Rep.* 128, 130.) *Heyliger* v. *Fire Ins. Co.* (11 *Johns.* 85.) *Cox* v. *May*, (4 *Maule & Selw.* 157.) *Story's Abbott*, 349. *Riley* v. *Horne*, (5 *Bingh.* 217 ; S. C. 15 *Eng. Com. Rep.* 422.) *Batson* v. *Donavan*, (4 *Barn. & Ald.* 35 ; S. C. 6 *Eng. Com. Law Rep.* 339.) 1 *Starkie's Evid.* 247. *Gibbon* v. *Paynton*, (4 *Burr.* 2302.) *Harris* v. *Packwood*, (4 *Taunt.* 264, 271.) *Shepard* v. *Wright*, (*Show. P. C.* 18.) 1 *Magens*, 76-7, pl. 65. *Sims* v. *Gurney*, (4 *Binn.* 513.) *Gray* v. *Waln*, (2 *Serg. & Rawle*, 229.) *Walker* v. *United States Ins. Co.*, (11 *Serg. & Rawle*, 64.) *Bedford Ins. Co.* v. *Parker*, (2 *Pickering*, 1.) *Watson on Arbitrations*, 161. *Kent* v. *Elstob*, (3 *East*, 13.) *Richardson* v. *Nourse*, (3 *Barn. & Ald.* 240.) *Taylor* v. *Coryell*, (12 *Serg. & Rawle*, 243.) *Benecke on Average*, 306-7.

For the *plaintiff* were cited, *Jacobsen's Sea Laws*, 346. *Plumer* v. *Mildman*, (3 *Maule & Selw.* 486.) 2 *Holt on Shipping*, 196. *Berkeley* v. *Presgrave*, (1 *East*, 220.) *Marshal on Ins.* 466 ; *Park on Ins.* 128. *Barker* v. *Phœnix Ins. Co.*, (8 *Johns.* 307.) *Stephens on Average*, § 14. *Lewis* v. *Williams*, (1 *Hall*, 430.) *Molloy*, book 2, ch. 6, § 12 ; 1 *Emeregon*, ch. 12, § 41 ; *Millar on Ins.* 335. *Caze* v. *Reilly*, (3 *Wash. C. C. Rep.* 298.) 2 *Magens Ins.* 200.

The opinion of the Court was delivered by

Kennedy, J.—No question was made on the trial of the cause that the stranding of the vessel did not place her and the cargo on board in danger of being lost, unless speedy measures were taken for her preservation. This being the case ; and the measures resorted to for the purpose of averting the danger which threatened the whole concern, having proved effectual in saving both, the vessel and cargo, became, as it would seem, the subject of general average ; so that the expenses thereby incurred in preserving the ship and cargo must be borne proportionally by all interested therein. It seems to be generally, if not universally received as law by all commercial nations, that a *voluntary* stranding to save the ship and cargo, where the ship is afterwards secured and performs her voyage, entitles to general average. *Jacobsen's Sea Laws*, (Frick's translation) p. 348. *Bynkers. Quest. Priv. Juris.* sec. 4, ch. 24, p. 424. *Voet*, b. 14, tit. 2, § 5. 2 *Magens*, 200-1. *Broadhurst* v. *Columb. Ins. Co.* (9 *Johns. Reps.* 14.) *Benecke on Ins.* 219. Mr. *Stevens*, although he admits this to be so, in his *Treatise on Average*, ch. 4, art. 2, yet pronounces it unreasonable and unfounded ; and assigns his reason for thinking so. Mr. Benecke, however, who has examined the subject with great care, as well as judgment, disagrees with Mr. Stevens ; and has proved very clearly, I think, that wherever the vessel and cargo are in a perilous, but not a desperate situation, and the measure of running her ashore has been deliberately adopted as best calculated to save the ship and cargo, in such case the damage sustained, according to fundamental principles, constitutes a claim for restitution. See *Benecke on Average*, 219, *et seq.* ; also *Broadhurst* v. *Columb. Ins. Co.* (9 *Johns. Rep.* 14.) Mr. Justice Story, likewise, in his note to *Abbott on Shipping*, 349, says, " indeed, no doubt seems to be entertained, that where the ship, after such voluntary stranding, is got off, and performs her voyage, the damage is a general average. The point of difficulty has been, whether, if she is totally lost by such voluntary stranding, and the cargo is saved thereby, the contribution is due." In *Caze* v. *Reilly*, (3 *Wash. C. C. Rep.* 298,) where the ship was wholly lost, but the cargo saved, Mr. Justice Washington, after an examination of the principal authorities, foreign and domestic, came to the conclusion, that contribution was due. And such is the rule

clearly contained in the *Prussian Ordinance of Konigsburg*, 2 *Magêns*, 200-1. It was decided, however, otherwise by the Supreme Court of New York in *Broadhurst* v. *Columbia Insurance Co.* (9 *Johns. Rep.* 9.)    But our own Supreme Court, in the case of *Gray* v. *Waln*, (2 *Serg. & Rawle*, 229,) has since, after a very full discussion of the question, sustained the doctrine of Mr. Justice WASHINGTON. So, though the damage immediately occasioned to the vessel or cargo by an accidental stranding be considered particular average, yet as in most instances such vessel is in danger of being lost, unless speedy and proper measures be used for her preservation, therefore the cost and expense of such measures, so far as they serve to avert the danger which threatened the whole concern, will be regarded as general average.    *Benecke*, 215.    Mr. Benecke, in his work on insurance, page 215, in speaking of accidental stranding says, " the charges of heaving a vessel off, without discharging her, are general average, since they are incurred for the benefit of all concerned; and so is *jettison*, resorted to for lightening and floating the vessel.    Charges and damages occasioned by unloading a stranded vessel, are general average, if the discharge was for the purpose of getting the vessel afloat, and that object be accomplished."    And in a preceding page, 200, he lays it down, that " when a part of the cargo is shipped over into lighters, or the long-boat, in order to extricate the ship and cargo from a perilous situation, as for instance, to set a stranded vessel afloat, or to lighten a leaky one, and bring her into the harbour, the charges of such a measure, as well as the *damage sustained by the goods* in consequence of it, undoubtedly belong to general average. It would be extremely preposterous to *exclude the loss of goods in lighters*, under a pretence that they were not intentionally sacrificed. They were exposed intentionally to an extraordinary danger for the benefit of the whole, and this is a sufficient title to compensation; for to *expose* another's property, or to destroy it, without compensation, would be equally unjust.    The Roman law directs in such cases, that " the goods put into the smaller vessel, if they miscarry, shall be considered as if cast overboard."    In conformity to this doctrine, it was ruled by the Supreme Court of the state of New York, in *Heyliger* v. *The New York Firemen Ins. Co.* (11 *Johns. Rep.* 85,) where the vessel was stranded near her port of delivery, in a very perilous situation, and her cargo transported thither in lighters and thus saved, that the salvage and the expense of the lighters, &c., were general average.    Also in the case of *The Bedford Com. Ins. Co.* v. *Parker*, (2 *Picker. Rep.* 1,) where the ship was accidentally stranded, within some nine miles of her port of destination, and by labour and expenses was set afloat again, and completed the voyage, the Supreme Judicial Court of Massachusetts held that the whole expenses constituted a general average.    Chief Justice PARKER in delivering the opinion of the Court, page 8, says, " the general principle, and a very just one, is, that when a vessel shall

be accidentally stranded, the expense of getting her off, so that she may proceed on her voyage, shall be borne proportionally to its value by every thing on board, as well as by the vessel." See *Phillips on Ins.* 363, § 12, and also under the head of *General Average,* p. 338.

These principles seem to have been conceded generally by the counsel for the defendants, but then the extent of the defendants' liability under them, as claimed by the plaintiffs, is denied; and on this point the parties are at variance. The expenses incurred with a view to extricate the vessel and cargo from the impending danger down to the time that the specie on board, belonging to the defendants, was actually delivered to them, they admit their liability to pay their proportionable part thereof; and have, I believe, paid to that amount long since without objection; but, as to all subsequent charges, they allege that they are and ought not to be made liable.

The counsel for the defendants allege, that when they received the specie, which was the only part of the cargo to which they had any claim, it could not be said, that after that, they had either actually or constructively any thing belonging to them on board of the vessel, or in the charge of the owners of her; and having nothing on board, nor any thing in the charge of the owners of the vessel, the expenses incurred subsequently could not be claimed to have been laid out on their account, or for their benefit, in any way whatever; and consequently it being utterly impossible that they could derive any benefit from such expenditure, it would be unreasonable and unjust to make them liable to contribution for any part of them. They maintain that all connection between them and the vessel, and the residue of the cargo, or concern with either, ceased immediately upon the actual receipt by them of the specie. In support of this principle thus advanced on the part of the defendants, the case of *Sheppard* v. *Wright,* (*Show. P. C.* 18,) has been cited. There the ship being laden with silk and oils, on her return home, was chased into *Malaga Mole,* by one of the *Toulon* fleet, which being in sight three or four days, then stood in for that port, as if they designed to attack the fort, whereupon the factor of the owners of the vessel sent the master a lighter to save what he could of the ship's cargo; and because the silks were of the greatest value, they were put on board of the lighter with a small portion of the oil first and carried to the shore. At night, however, the French left the port, when the master ceased to land any more of the cargo. About six days afterwards, the French fleet appeared again before Malaga; when, notwithstanding every possible exertion was made that could be, to prevent the French from getting the ship and remaining part of the cargo, they took both away. The silks were afterwards put on board of another vessel and delivered to the respondents at London, who paid the freight for them. The appellants, being the complainants and the owners of the ship and oil, brought their bill

against the respondents, who were the owners of the silks, to have contribution for their loss; but the Court of Chancery made a decree dismissing the bill, which was affirmed upon appeal by the house of lords. The decree may be correct, because it is perfectly clear that the safety or the preservation of the silks was not owing to the loss of the ship and the oil, or of either. *Abbott on Shipping*, tit. *General Average*, p. 346. Nor is that part of the cargo, which is shipped into a lighter for the common benefit of all concerned and arrives safely, liable in any case to make contribution, where the vessel miscarries; because the lighters and goods on board of them do not owe their preservation to the loss of the principal vessel. *Benecke on Insurance*, tit. *Average*, p. 212. But in the case under consideration, the principal vessel and the residue of her cargo, left on board at the time the specie of the defendants was taken from her and put into sledges on the ice, were brought subsequently into port by the extraordinary exertions of the master. All then being saved by means of these exertions, which were used for the speedy preservation of the vessel and cargo, when stranded and in danger of being lost, would seem to bring this case within the principle laid down by the authorities mentioned above which would entitle the plaintiffs to contribution.

The ground of objection presented by the defendants' counsel to the plaintiffs' claim, is not only plausible, but on first view would seem to have great force in it. In order, however, to test it thoroughly, it would be proper to see what the practical operation of the principle contained in it would lead to; because if it should be found to operate unequally upon shippers, whose rights and claims are in every respect similar and equal, and should at the same time put it in the power of the master of the vessel, to throw the greatest proportion of the expense, incurred by the measures taken to save the vessel and cargo, upon whomsoever of the shippers he pleased, it would be inexpedient and unjust to adopt a principle of such tendency. Suppose then, for example, that a vessel, with a cargo of the same kind of goods throughout on board, belonging to twenty different owners, each owning an equal quantity, is run on shore within eight or nine miles of the port of destination for the purpose of saving her and her cargo from an impending danger, when it becomes requisite to unlade the vessel, and to convey the cargo thence by wagons to the place of delivery, in doing of which two months are consumed, it is obvious, that according to the principle contended for on behalf of the defendants, the owner whose goods are first taken out of the vessel and conveyed immediately to him, will have comparatively but little of the whole expense to pay, whereas, he who receives his goods last, will have perhaps more than twenty times as much to pay as the first. The charges being made general average, as to the first who receives his goods, down to the time of their being delivered to him, the last has to pay one-

twentieth part of these charges, and upon the same principle, one-nine-teenth of the expenses attending the saving and delivery of the goods to the second, and so on till his own turn comes, when he has to pay all the expense of saving his own portion of the cargo. If this would be the natural operation of the rule contended for by the defendants, and that it would be in some cases which may arise, I think, is perfectly clear, it would work great injustice; because it would sub-ject those, whose goods are saved and delivered last, to the payment of a portion of the expenses incurred in saving those of the first, without requiring the first to pay any part of the expenses incurred in saving the goods of the last, but leaving them to pay the whole of it themselves. Thus, we see, that the rule would operate partially and unequally, without imposing the obligation of reciprocity, which seems to be at the very foundation of *general* average. To save the vessel and cargo, upon such occasions, from the danger or peril with which they are threatened, frequently requires a series of acts to be performed, which may require weeks, or even months, in order to effect every thing growing out of the danger which rendered it expedient to run the vessel on shore, for the purpose of preserving her and the cargo from it. This being the case, it is impossible to apportion the expense in such manner, as to do equal justice to all concerned, without including all the expenses incurred by the various acts and measures performed and taken, which served to preserve the vessel and every part of the cargo from the common danger, with which all were threatened; and making each one then concerned, pay his proportionable part of the aggregate thereof according to the value of his interest in the vessel and cargo, or either. This would seem to be in conformity to what Mr. Holt, in his *Treatise on Shipping*, has said on this subject, page 482. "General average, is, in a word, the common law and justice of partnership; and defined according to its nature, is a compensation from the common stock of a sea venture, in the several proportions of the partners in of it, for the special loss or sacrifice made by one or more for the common good." Now, in the case before us, it must be admitted that the property of the defendants and that of the plaintiffs, formed, as it were, a common stock of a sea venture, held by them in their several proportions as partners, and that all were alike exposed to the same common danger, from which the stock belonging to the defendants was saved, and a proportionable part of the expense incurred by saving it, paid by the plaintiffs; and why shall the latter not receive from the former a proportionable part of the expense incurred in saving their portion of the stock from the same common danger? Natural justice seems to require that they should. No case, and as it appears to me, no authority has been adduced which goes to sustain the principle contended for, and the distinction taken on the part of the defendants. The ordinance of Konigsburg, No. 827, 2 *Mag.* 200, has been referred to, declaring

that the connection between the ship and cargo is in force, as long as they shall remain together, but shall cease upon the goods being landed at the appointed port, out of the ship, or *the lighters* or *boats belonging to it;* and every part of the goods when brought ashore in a proper place, shall be *immediately* clear of the connection; so that it shall have nothing to claim from the other goods or ship, for any subsequent damage happening to it, and likewise shall *contribute nothing to any that may afterwards happen to them.* It has been argued, that the principle of this ordinance is applicable to the case of the defendants, and shows that they are not liable to the claim of the plaintiffs. This ordinance, from its language, would seem to have been intended only for cases of goods being discharged from the ship by the usual and ordinary mode, before any imminent danger, creating loss or damage has arisen; for it speaks of " the goods being landed at the port out of the ship or lighters or boats *belonging to it,* (ship;)" which may be thought to exclude those emergencies where means of safety, not properly *belonging to the ship,* have to be resorted to. But still, supposing it to extend further, and to contain nothing more than what is recognised as a rule of law generally, in commercial countries, it can at most only be extended to cases of damage or loss or injury to the ship or goods, and not to expenses incurred by saving the ship and goods from some imminent danger, which threatened the interests of all, both the owners of the ship and the goods, before any of the goods were landed. We have endeavoured to show above, that general average, on account of injury to, or loss of the ship and any part of the cargo, or of either, and the same of expenses incurred in saving and preserving them from being lost or injured by imminent danger, turn, in some respects, upon different principles, and are therefore to be governed by different rules of decision.

It has also been said and advanced as an argument in favour of the defendants, that as their part of the cargo consisted of specie and was greatly the most valuable part of it, they were therefore entitled to a preference in having it removed from the vessel first, and consequently ought not to be made to contribute to the payment of expenses incurred subsequently to the receipt of their portion of the cargo, for saving the property of others, over whom they were entitled to a preference as a matter of right. If the removal of the specie from the vessel and the exposure of it in the sledges on the ice was evidently less dangerous than leaving it in the vessel and removing the other parts of the cargo for the purpose of preserving the whole, it was the duty, perhaps, of the master to do so. But in case of a general average, on account of part of the cargo being ejected for the purpose of saving the ship and residue of the cargo, the owners of specie, diamonds or precious stones, are required, for having such preference allowed to them, in the retainer of their portion of the cargo on board, to contribute towards making good

the loss sustained by those whose goods are ejected, according to the value of the specie &c. and not according to their weight or bulk, which being of but small account, would not have tended to preserve the vessel and remaining part of the cargo, even if they had been thrown overboard. 1 *Park on Ins.* 209, ch. 7, (7th ed.) So that the preference claimed in this respect, if it has any bearing upon the question raised here, would rather seem to make against the defendants than for them, by making them pay, by way of contribution to the whole expense incurred, a suitable equivalent for it to those who were postponed on account of their interest. The reasoning of Mr. Benecke, in pages 306-7 of his Treatise on Insurance, is in favour of the plaintiffs' claim. He says, " goods shipped into barges for the purpose of lightening and saving the vessel and remaining cargo, must contribute to the general average like goods thrown overboard. If, after those goods are separated from the principal vessel, the latter were to incur a fresh general average, unconnected with the former, it might be urged that the goods transhipped, should not contribute to this for their full value, but only to the extent of the claim which they have upon the vessel, her remaining cargo and freight, for charges and damages sustained ; because the goods in the barges not being liable for a subsequent loss of the ship and the goods left on board (ante, page 212,) they are no longer interested in their fate, except in regard to their demand upon them for the former general average, which would be lost with the vessel. But on the other hand, the ship and cargo remaining answerable for any future accident, which may befal the goods transhipped, till they reach their destination in safety, the owners of such goods would have a decided preference before those of the goods remaining on board ; because the situation of the former could in no case, after the ship escaped the danger which occasioned the transhipment, be worse, but frequently better, than that of the other parties : *whereas the situation of all parties will remain alike, as it ought to be, if the goods put into barges are considered as having remained on board till the completion of the voyage.*" We therefore think the verdict ought to stand. The motion for a new trial is refused and judgment rendered upon the verdict.

Judgment for the plaintiffs.