## THE L'AMERIQUE.

## COMPAGNIE GÉNÉRALE TRANSATLANTIQUE *v.* HOGUET *et al.*

(*District Court, S. D. New York.* July 10, 1888.)

1. SHIPPING — GENERAL AVERAGE — STRANDED VESSEL — CARGO FORWARDED — SUBSEQUENT EXPENSE — FREIGHT.

When a stranded vessel cannot be got off except at great expense and delay, and the cargo is unloaded by the master for the benefit of the ship and cargo, but without any intention of reloading it in the same vessel, and it is forwarded by other means to its destination, and delivered to the consignees at comparatively small cost, the common interest, as well as the common risk, between ship and cargo, ceases with the unloading; only the expense of unloading, not the subsequent expenditure in floating the vessel, is a general average charge against the cargo; and the cost of subsequent transportation is particular average against the cargo alone, and the ship is entitled to her whole freight.

2. SAME — BOND — CONSTRUCTION.

An average bond, executed in New York, provided for an adjustment "in accordance with the established usage and laws of this state." There being no statutes of this state, or practice under them, different from the general maritime law of this country, *held,* that this provision bound the parties to an adjustment in accordance with the general maritime law, so far as that determines the general rules of apportionment; and to the practice of adjusters, as respects those details which the law leaves to local custom; and that under such bond a cargo owner might inquire whether the rule of apportionment adopted was in accordance with our maritime law.

In Admiralty.

The above libel was filed by the owners of the French steam-ship L'Amerique to recover $1,911.90, claimed as a general average charge assessed upon 16 bales of raw silk, part of her cargo consigned to the respondents. The steam-ship, being of about 3,000 tons register, and bound from Havre to New York, when about three miles south of Sandy Hook, and in charge of a pilot, on January 7, 1877, stranded on the beach at Seabright, on the Jersey coast, in thick weather, and in an easterly gale. On the following day Mr. De Bebian, the libelant's agent in New York, visited the steamer, and in conjunction with some of the underwriters employed the Merritt Coast Wrecking Company to unload and deliver the cargo, and get the ship off the beach. The wrecking company immediately commenced unloading, with the assistance of the master and crew. A part was landed on the beach; a part in lighters and schooners. That landed on the beach was carried by the railroad near at hand to Sandy Hook, and thence by steamer some 20 miles to New York, and delivered to the consignees. That loaded upon lighters was mostly put on board schooners and carried up to the port, and likewise delivered to the owners. All the cargo, except a very small amount that remained on board the ship, was thus unloaded and delivered by the 1st of February; the respondents' goods were all delivered by January 23d. Prior to the delivery of the cargo, the respondents and the

other owners to whom cargo was delivered executed a bond, dated January 7, 1877, which recited the stranding, the need of assistance, that certain losses and expenses "had been incurred, and that other expenses thereafter may be incurred, which, according to the usage of this port constitute a general average;" and provided that the subscribers and owners of the cargo "would pay their share of any loss, damages, or expenses that should be made to appear to be due from them," provided the same should be "apportioned by Mr. Paulison, average adjuster, in accordance with the established usage and laws of this state in similar cases." The cargo was of a miscellaneous character. About $115,000 in specie was first landed on the beach on the 9th of January. Upon the following day pictures to about the same value were landed on the beach. The rest of the cargo was unloaded from time to time, as the weather would permit. Some hides, millstones, and rattans, to the amount of from 10 to 20 tons, remained on board, which it was not thought necessary to discharge, and which were subsequently brought into port with the ship. After the landing of the cargo, continuous efforts were made to get the vessel off, until the 10th of April, when she was floated. Several times she was carried by gales well up on the beach; but never completely out of the water. Steam was kept up constantly in her engines, to aid in getting her off. · When she floated on April 10th, she came into port by her own steam-power; but with the help of tugs for steering purposes, as she had lost her rudder. The entire expense charged to general average was $135,099.03, of which $110,000 was for the services of the Coast Wrecking Company. The remainder was for damage to the cargo in landing through the surf; for broken packages; allowance for fuel consumed by the steamer in keeping her pumps going; helping to discharge; and provisions for the men employed, etc. The apportionment was as follows: Vessel, value $258,370, charged $41,021; freight, value $2,250, charged $357; cargo, value $590,295, charged $93,720. Total value, ship, freight, and cargo, $850,915. General average, about 16 per cent. Total, $135,099. The respondents, having insured in the Great Western Insurance Company, refused to pay the amount assessed on their goods, because that company objected to the mode and validity of the apportionment, and the defense is virtually by the insurance company.

Coudert Bros., (F. R. Coudert and Edward K. Jones, of counsel,) for libelant.

Evarts, Choate & Beaman, (Treadwell Cleveland, of counsel,) for respondents.

Brown, J. 1. On behalf of the libelants it is claimed that, irrespective of any question as to the legal correctness of the mode of apportionment, the respondents are liable under the terms of the bond; because, as it is said, the apportionment was made by "Mr. Paulison, in accordance with the established usage and laws of this state in similar cases," as the bond required. No doubt, where the language of a contract stipulates for per-

formance according to a specific custom, that custom, if valid, will control, though the general law be different; for the express contract makes the law in such a case. *Simonds* v. *White*, 2 Barn. & C. 811; *Stewart* v. *Steam-Ship Co.*, L. R. 8 Q. B. 88, 362. In the last case cited the bill of lading provided that any "average should be adjusted according to British custom;" and it was admitted to be the practice of British average adjusters not to treat the loss there in question as a general average loss; and the stipulation was therefore held controlling, although the law was otherwise. *Wire Co.* v. *Savill*, 8 Q. B. Div. 653, 660; *Schmidt* v. *Steam-Ship Co.*, 45 Law J. Q. B. 646. But the terms of this bond, providing for an adjustment "in accordance with the established usage and laws of this state," cannot mean the adoption of any mere practice of average adjusters that is contrary to law; not, at least, unless it is shown that there are some statutes of this state, and a practice under them, different from the general marine law of this country. Nothing of this kind appears in evidence. There are no such statutes, and no such usage is proved. The actual intent of the adjuster was, as he testified, to make the adjustment "in accordance with the practice and the law, as he understood it." The limitation of the bond is, further, to such practice and laws "in similar cases." No cases precisely similar are proved, nor any "established usage," independent of the legal right. As there are no statutes of this state on the subject of apportioning general average, the use of the term "laws," in this bond, cannot be restricted to state statutes; for that would leave the word no signification at all. The intent of the bond is, as it seems to me, to bind the parties to the law and practice prevailing here,—to the law, so far as that determines the general rules of the apportionment; to the practice, as respects those details which the law leave to local custom. The bond was evidently not intended to bind consignees to any principle of apportionment that the law will not uphold; and it does not have that effect. It is, therefore, open to the respondents to inquire whether the rule of apportionment adopted is in accordance with our maritime law.

2. The respondents contend that the charges incurred for getting the vessel off the beach after the cargo was landed and delivered to the consignees were not, in this case, general average charges; and that the principle of the apportionment is to that extent wrong. The amount of these charges is large. If they are erroneously embraced in the assessment, the error is material, and no decree can be entered, except upon a proper adjustment of the general or particular average charges against the respondents' part of the cargo. The principle on which general average is founded is, that where an imminent peril common to all has been averted by some sacrifice or extraordinary expense, voluntarily made or incurred by a part for the safety of all, the loss shall be made good by the contribution of all. The simplest case is that of jettison, which contains the germ and the principle of the whole doctrine. If a vessel, therefore, is stranded through a peril of the seas, and her situation is such that the only way to prevent the destruction of the cargo, as well

as of the ship, is to get the ship afloat, the expenses of getting her off ought to be a charge against all, because the sacrifice or expense is necessarily incurred for the safety of all. The ship ought not in such a case to pay the whole charge, because her contract of transportation excepts "perils of the seas," and therefore excepts extraordinary expenses consequent upon such perils, so far as they are incurred for the common safety. But the stranding, on the other hand, may possibly involve no danger to the goods, as by stranding on a river shore, or on a beach, where, though the ship might be broken, no peril was likely to happen to the cargo. *The Alcona*, 9 Fed. Rep. 172. Or, again, the stranding might be so disastrous as obviously to necessitate the abandonment of the ship. In the former case there would be no common peril, and in the latter no remaining community of interest; in neither, therefore, would there be any common average charge. *Insurance Co.* v. *Ashby*, 13 Pet. 330, 340; *Williams* v. *Insurance Co.*, 3 Sum. 510. See *L'Admiral Casey* and *Ville d'Ageer*, Gourlie's Average, 413, 414, note. In the adjudged cases the facts are usually much more complicated. There is no disagreement as to the general principles; the difficulty is in their application to the particular circumstances of each case.

The most important circumstances in the present case are the following: (1) The stranding was by a peril of the seas, and the position of the vessel most unfavorable for hauling her off. It was evident from the first that the task must be long and expensive, and the result doubtful. (2) It was within a few miles of the port of destination; and the cargo could be discharged and delivered at once, with comparatively little difficulty or expense. (3) The discharge of the cargo was begun at once, before any efforts were made to haul the ship off. The discharge was not made with any view to reloading, but for the purpose of immediate forwarding and delivery to the consignees at New York; in part, also, for the purpose of lightening the ship, and as a necessary preliminary to the work of hauling her off. (4) Though the cargo was not in immediate peril, yet, considering the exposure of the stranded ship to easterly gales in the winter season, the unloading was necessary as a precautionary measure for the safety of the cargo, independently of the purpose of immediate delivery. (5) The cargo, from the moment of the ship's stranding, had no actual interest in hauling the ship off, nor in her further prosecution of the voyage. The great expense and delay plainly necessary to float the ship made immediate separation from the ship to the interest of the cargo. Its only common interest with the ship was in immediate unloading, and safe delivery to the consignees. The freight was thereby earned. (6) The work and the expense of unloading were entirely distinguishable and separable from the work of getting the ship off; though the former was a necessary preliminary to the latter. (7) The expenditures in getting the ship off were chiefly, if not wholly, incurred after the cargo had ceased to be at risk, and after the cargo was out of the master's control, through delivery to its owners. (8) The effect of the general average is to impose upon the cargo, above the whole

cost of unloading, a charge of some $60,000 or $70,000 for separable expenditures in hauling the ship off, in which the cargo had no interest. (9) When the ship was finally floated, about 10 weeks after most of the cargo was delivered, she was taken to New York, her port of destination, to deliver what little remained of her cargo, and to repair; her master and crew being all the time on board.

I have found no adjudicated case in which, upon facts like these, the expenses of getting the ship off have been held to be general average. In *Sparks* v. *Kittredge*, 9 Law Rep. 318, such expenses were held by SPRAGUE, J., not to be general average. In *Bevan* v. *Bank*, 4 Whart. 301, the cargo in general was unloaded for the purpose of reshipping, and was reloaded and carried by the same ship to its destination. The specie only was forwarded by other means, and that was nevertheless held liable to contribute. That case has ever since been generally disapproved. Upon facts quite similar, in the case of *Royal Mail* v. *Bank*, (1887,) 19 Q. B. Div. 362, the decision, upon full consideration, was to the contrary. In *Nelson* v. *Belmont*, 21 N. Y. 38, the specie, which was held liable to contribute, remained under the control of the master; and none of the expenses objected to were incurred after the delivery of the cargo or any part of it. In *Moran* v. *Jones*, 7 El. & Bl. 532, the few goods unloaded belonged to the ship-owner, and all were reloaded and carried to their destination in the same ship. In the leading case of *McAndrews* v. *Thatcher*, 3 Wall. 347, the principal cases up to that time (1865) were considered, and a *resume* was given by Mr. Justice CLIFFORD of the law upon the English and American authorities. In that case, the ship Rachel having run upon the west bank, in the lower bay, in coming into New York harbor, it was found necessary to discharge the cargo into lighters, which were thence brought up to this port; but the vessel sank deeper into the sand. The master incurred no expenses in trying to get the ship off after discharging the cargo, but abandoned her to the underwriters. The latter immediately resumed the work, and after about 11 weeks got her free, but at an expense somewhat greater than her then value. It was held that the cargo was not liable to contribute for the expenses incurred after the master had abandoned her, on the ground that there was no community of interest thereafter remaining between the ship and cargo.

Since the decision in *McAndrews* v. *Thatcher*, the liability of the cargo to contribute in general average, and the various circumstances affecting this liability, both in cases of stranding, and as regards expenses at a port of refuge, have received repeated and elaborate consideration in the English courts. *Walthew* v. *Marrojani*, L. R. 5 Exch. 116; *Wilson* v. *Bank*, L. R. 2 Q. B. 203; *Atwood* v. *Sellar*, 4 Q. B. Div. 342, 5 Q. B. Div. 286; *Svensden* v. *Wallace*, 13 Q. B. Div. 69, (1884,) affirmed in the house of lords, 10 App. Cas. 404; *Royal Mail, etc.,* v. *Bank*, 19 Q. B. Div. 362, (1887.) The result of these discussions and adjudications is that, except where, as in *Atwood* v. *Sellar*, the expenses have been rendered necessary by some previous voluntary act of sacrifice for the safety

of the ship and cargo, they cannot be made a general average charge, unless at the moment when such expenses are incurred there is a danger, common to the ship and cargo, which they are designed to remove; and that, consequently, when the cargo is safely unloaded and warehoused, subsequent expenses, such as those incurred in floating the ship, or reloading the cargo in a port of repair, (not caused or made necessary by any voluntary sacrifice,) are not general average charges.

As respects the question considered in *Svensden* v. *Wallace*, viz., whether reloading in a port of repair on account of a sea peril is a general average charge, the reasons assigned by Lord Esher for the distinction between unloading and reloading the cargo do not seem to me satisfactory; for, if unloading can in such a case be properly treated as "a part of the act of going into port to repair," *i. e.*, a part of the act of sacrifice for the safety of all, so as to make unloading a general average charge on that ground, as he says it may be, (page 77,) the warehousing and reloading should be general average charges also, because they are the necessary consequence of that act of sacrifice; and all agree that the necessary expenses consequent upon a voluntary act of sacrifice are common average, and cannot be inflicted upon either ship or cargo alone. *Birkley* v. *Presgrave*, 1 East, 228; Lown. Av. (4th Ed.) 218; German Code, § 708, subd. 4. If, on the other hand, unloading is no part of "the act of going into port to repair," and is not required for the safety of the cargo, but only in order to repair the ship, then unloading, from the English point of view, is not logically a general average charge, unless repairing is also a general average charge, which, in general, it is not. Bowen, L. J., thought it the ship-owner's duty to "proceed with the voyage, or land the cargo," which would impose the expense of unloading on the ship alone; but, as unloading was allowed to be common average by general consent, he thought it "unnecessary to decide what would be in other cases the law on the point." He concurred in holding warehousing and reloading in a port of repair, sought in consequence of injury by a sea peril, to be, ordinarily, not general average charges; "because, when the goods were landed, all danger common to ship and cargo was ended." Page 89. In the house of lords the decision was affirmed on somewhat peculiar grounds. Lord Blackburn, in referring to the general subject, suggested whether "the whole of these operations [unloading, warehousing, and reloading] should not be considered as parts of the expense of repairing the damage, and therefore to be borne by all, [ship, freight, and cargo,] in a case where the cause of damage [a previous voluntary sacrifice] was such that the expense of repairing ought to be borne by all; but to be borne by the ship only, in a case where the cause or damage [a mere peril of the sea] was such that the expense of repairing it ought to be borne by the ship only." This intimation from the court of highest authority that the expenses in the last case would be chargeable on the ship only, accords with many French decisions. See 2 Conlon, Code Ass. p. 28, § 44. Boulay-Paty, in his *conference* on Emerigon, (volume 1, pp. 620, 621,) says it is a charge on the cargo only. Emerigon

(volume 1, p. 608) and Pardessus (volume 3, p. 740) make unloading and reloading common average. In general, however, the French authors maintain that the primordial fact as to the nature of the cause of the damage, viz., whether it arises through a sea peril or by a voluntary act, controls; and that the consequences of a particular average injury, *i. e.*, by a sea peril, remain particular average, save such consequential voluntary acts as are done to save all from immediate loss. 5 Bedarride, Droit Com. Mar. § 1669; 4 Desjardines, Droit Com. Mar. §§ 982, 1005; 5 Valroger, Com. Droit Mar. § 2644; 2 Conlon, Code Ass. 20, § 6. In this country all such expenditures in a port of refuge are charged to general average. *The Star of Hope*, 9 Wall. 236; *Fowler* v. *Rathbones*, 12 Wall. 102, 117; *Hobson* v. *Lord*, 92 U. S. 397.

All agree that in order to subject goods to a common average charge, they must be at risk, and have a community of interest with the ship, at the time when the charges are incurred; and that the act of sacrifice, or the expense, must have been done or incurred for the safety or benefit of the goods, and not merely for the prosecution of the voyage, since, otherwise, ordinary repairs of the ship would be general average. Accordingly, in the very recent case of *Royal Mail* v. *Bank*, 19 Q. B. Div. 362, where a quantity of specie was taken from the stranded steamer Tagus, and forwarded by another vessel, and the ship was subsequently got off after a jettison of part of the cargo, and proceeded on her voyage with the remainder, it was held that the specie was not liable to contribute in general average for any of the expense of getting off the ship, nor for jettison of the cargo; on the ground that the unloading of the specie "was not in any sense or degree a means of securing the common safety of the ship and cargo, but simply for the purpose of saving the specie itself; and that, when the general average loss was incurred, in whatever sense restricted or enlarged, that phrase can be properly used,—the specie had ceased to be at risk; and that upon no reasonable view of the facts could its removal be considered as a part of the means taken for saving any common adventure." In the previous case of *Walthew* v. *Mavrojani*, (1870,) L. R. 5 Exch. 116, the ship Southern Belle, while lying loaded in the port of Calcutta, was driven by a cyclone on a mud bank. To get her off it was found necessary to unload her, and the cargo was discharged and safely warehoused at Calcutta by the ship-owners. She was floated in about 10 weeks, at an expense of £2,300, and her cargo reshipped on board of her, and conveyed to its destination. It was held that the cargo was not liable to contribute to the expenses after it was warehoused; because from that time there was no common danger, and because it was a matter of indifference to the cargo whether it was transported by the same ship or by some other, and the cargo consequently had no common interest in floating the ship. If these recent English decisions were followed as the true interpretation of the law, the expenses incurred in this case subsequent to the discharge of the cargo could not be charged as general average, for the stranding was not voluntary, but through a peril of the seas; and these expenses were incurred after the cargo had been

delivered, and when it was no longer at risk, and after the voyage, so far as respects the most of the cargo, had ended, and after the cargo had ceased to have any further common interest with the ship.

3. It is contended, however, that there is such a divergence between the English and American law on the subject of general average, that the decisions of the English tribunals should not be followed. There is, doubtless, some divergence as respects the expenses in a port of refuge sought in consequence of damage from a sea peril. But the expenses here in question are not of that class. And in the opinion in *McAndrews* v. *Thatcher, supra*, there is no intimation of any divergence or incompatibility between the law of this country and that of England, as regards general average expenses in a case of stranding. The early and the late English cases are there cited, as well as the principal American authorities; and the apparent aim was to express the result of them all. There is no disapproval of the decision in *Job* v. *Langton*, 6 El. & Bl. 779; and the case of *Moran* v. *Jones*, 7 El. & Bl. 532, is only concurred in upon the emphasized consideration that "the goods remained under the control of the master until the ship was got off, repaired, and enabled to take the goods on board and prosecute her voyage." In the present case the facts are the opposite. Though *Moran* v. *Jones* was there deemed consistent with the previous case of *Job* v. *Langton*, in the subsequent English cases it has not been so considered. The decision of *Moran* v. *Jones*, even upon its special facts, has been since disapproved; that of *Job* v. *Langton*, in which the expenses of getting the ship off after the cargo was in safety were held not general average, has been uniformly approved and followed. In the present case different passages in the opinion of Mr. Justice CLIFFORD are cited as sustaining the contentions on each side. The passage most favorable to the libelants, however, (page 370,) does not say that, if the master in that case had incurred the useless expense which the underwriters incurred, he might have been allowed to make a profit out of the cargo by means of a general average charge upon it for the useless and losing operation of raising the ship. The immediate context indicates the contrary. On the other hand, "the undoubted rule" that "goods are not to contribute for expenses incurred after they cease to be at risk,  *  *  *  nor to any loss or expense' which was not for their benefit," (page 369,) would exclude the present claim. Phillips' rule, moreover, is quoted, (page 367,) to the effect that, if the vessel upon discharge of cargo does not float, the subsequent expenses of getting her off must be borne by the vessel; and the only qualification put upon that rule is that the expense may be general average in case the master "can rescue her without much expense and delay, and receive the cargo, and transport it to its destination," (page 368;) conditions quite contrary to those in the present case.

The case of *Nelson* v. *Belmont*, 5 Duer, 310, 21 N. Y. 36, is also referred to by the court. There the ship Galena, loaded with cotton, having caught fire in her hold from lightning, had to put back to Charleston to extinguish the fire. The master, for safety, deposited on board a

Danish bark a considerable quantity of specie, which it was agreed should remain under his control. On arrival at Charleston he resumed possession of the specie, and the fire was put out by flooding the ship, doing considerable damage to the rest of the cargo, and some to the vessel. The specie was forwarded by the master to its destination; but the ship's voyage was broken up, and the cotton was sold. The specie was held liable to contribute to the expense and damage caused by the return to Charleston and putting out the fire, the same as if it had remained on board the Galena. In the court of appeals SELDEN, J., says, (page 47:)

"If the captain had put the specie on board the bark, not in any event to be returned, but to be taken by the bark to its own port of destination, and the latter had then been suffered to pursue its course, the specie would clearly not have been subject to contribution for any subsequent expenditure to save the Galena; and the same, if, when put on board the Danish bark, it had been distinctly understood that the specie was in no event to be restored."

Such were clearly the understanding and the expectation upon which the unloading and delivery of the cargo in this case were made. Judge Marvin, in stating the results of the case of *McAndrews* v. *Thatcher*, observes:

"Notwithstanding some uncertainty in the precise meaning of the language employed by the supreme court in its decision in the case of *McAndrews* v. *Thatcher*, yet I think this case, when interpreted by the case of *Nelson* v. *Belmont*, to which we have referred, does decide that a complete separation of the cargo from the ship by the master or owner, not again to be returned to the ship, dissolves the community of interest between them, whether such separation takes place at a distance from the port of destination, or by a delivery by lighters at the port of destination; and that consequently all general average charges thereafter cease. Such a separation, when it takes place at a distance from the port of delivery, is equivalent to the abandonment of the voyage; and when it takes place by a delivery at the port of destination, it is equivalent to a completion of the voyage as to the cargo, which can no longer derive any benefit from the expenditure of money on account of the ship." Marv. Av. 61; Gourl. Gen. Av. 400–402, note; *Sparks* v. *Kittredge*, 9 Law Rep. 318; *Graham* v. *Welsh*, *infra*.

4. Again, the question whether in case of misfortune a common interest still remains between ship and cargo, and the extent of that common interest, are questions of fact depending on the circumstances. See *The Amelie*, 6 Wall. 18–27; *The Julia Blake*, 107 U. S. 418, 427, 2 Sup. Ct. Rep. 692, and cases there cited. If the cargo can be unloaded and be delivered by other means at very much less expense than by the stranded vessel, the cargo has no actual common interest with the ship in the further prosecution of her voyage. In the present case, about $100,000 was necessary to float the ship after the cargo was unloaded; while scarcely more than a third of that amount was necessary to unload the cargo and deliver it to its owners. The cargo, by means of a general average assessment, is sought to be charged with some $60,000 or upwards, on account of the subsequent expense of getting the ship off, though the cargo had no actual interest in that work. It is plain that this is not compatible with the fundamental principles of general average contribution, un-

less the entire proceeding of unloading the cargo and getting the ship off may be rightly dealt with as essentially one act, done for the common safety of both. When the unloading makes the ship float, that act is doubtless a single act, and is a general average expense. And when, as Mr. Justice CLIFFORD says, (3 Wall. 366,) "the master, with the usual appliances at hand, without much expense or delay, can haul her off and complete the voyage," it will usually be to the common interest of ship and cargo to do so; and then the whole expense should be apportioned. But the work of a wrecking company, necessarily continued from two to three months, and at large expense, in getting the ship off, after the cargo is discharged and delivered, cannot be the same act as discharging the cargo. _Job_ v. _Langton,_ 6 El. & Bl. 779, 791; _Svensden_ v. _Wallace,_ 13 Q. B. Div. 69, 79, 86. The nature of the stranding, in a case like this, in and of itself divorces the interests of the ship from the interests of the cargo, except as to the mere act of unloading. The acts necessary for the safety of each, in such a case, are not the same. As respects the ship, unloading is a mere preliminary work; but, being necessary to the safety of ship and cargo, separately considered, each should bear its average of that expense. Beyond that, and after that, the interests of each are wholly separate. There is no further community of interest.

The unloading, also, having been done with a view to the immediate delivery of the cargo by other means, amounted to a termination of the voyage, as between that ship and the cargo. The transhipment into other vessels involved the cargo in new sea-risks, and in the liability to a new and independent general average charge with those vessels, in case of any new peril. Although, for the purposes of earning freight, the transhipment and forwarding of cargo by the master might in some cases be deemed merely a performance of the original undertaking, _i. e._, of the personal contract to deliver at the port of destination, here the subsequent voyage in the other vessels was no part of the voyage of the L'Amerique herself, and hence constituted no common interest with that ship itself, but only with her freight; a wholly different subject in the view of the law of general average. The new transportation involved, as I have said, new and independent rights, liabilities, and obligations. The unloading itself, therefore, made for such purposes, in a case like this, distinguishes and separates the cargo from all the subsequent work of hauling off the ship as independent work, done for an independent interest, and on account of the ship only. The separation of interests became thereby complete, and the subsequent expenses incident to each interest should remain separate. _The Ann D. Richardson,_ Abb. Adm. 499, 507; _Graham_ v. _Welsh,_ 45 Phila. Wkly.Notes, No. 27; _The Joseph Farwell,_ 31 Fed. Rep. 847.

5. The same conclusion follows from considering the duty and the authority of the master, and the limitations of his authority, as respects the cargo, in a case of misfortune and distress. When different courses are open to him, he is bound to act for the interests of each, and as a prudent owner, if present, would presumptively act, and have a right to act.

He is not authorized to sacrifice the ship to the cargo, nor the cargo to the ship. *The Onward*, L. R. 4 Adm. & Ecc. 38, 57; *Kemp* v. *Halliday*, 6 Best & S. 723, 748; Lown. Av. (4th Ed.) 161, 162. As between different alternatives, he has no right, therefore, to adopt a measure that is very burdensome to the cargo merely for the ship's interest, when the cargo interests can be otherwise far more economically conserved. When a severance of the associated interests is easily practicable, and would plainly be required by the owner, if present, the master, as his representative, is bound to make the separation; and if a separation is actually made, as in this case, it should be deemed done in accordance with the rights and the interests of the cargo owners. It is well settled that the owner of the cargo, on an interruption of the voyage by misfortune, may, upon tender of the freight and any lawful charges, repossess himself of his goods, and thus effect a complete separation from the ship, and avoid any subsequent contribution. *The Julia Blake*, 107 U. S. 418, 2 Sup. Ct. Rep. 692, affirming 16 Blatchf. 472, 486; *Nelson* v. *Belmont*, 21 N. Y. 36, 42, 47. If the ship cannot complete her voyage without making use of the cargo at a greater expense to the cargo than unloading and forwarding it by other means would involve, then the master has no authority to make use of the cargo at all, without the owner's consent, for the ship's relief, or merely for the purpose of completing her voyage. It was upon this precise ground that the case of *The Julia Blake, supra*, was decided. The doctrine was there reaffirmed that it is "necessity that develops the master's authority and limits his powers." Before imposing an extraordinary burden on the cargo, the necessity for it, as respects the cargo interests, must appear. The master "must endeavor to hold the balance evenly between his two principals." He cannot create heavy charges on the cargo, it was held, when the cargo will not thereby receive a corresponding benefit; nor when the latter's interest may be otherwise fully protected at greatly less expense; as by forwarding the cargo through other means of conveyance. 107 U. S. 429, 432, 2 Sup. Ct. Rep. 700–703. In such cases the cargo is under no *necessity* for the heavy expense, and hence there is no authority to incur it. On this point the chief justice further observes:

"The cargo owner is not bound to help the vessel through with her voyage under all circumstances. It is the duty of the vessel owner, and of the master as his appointed agent, to do all that in good faith ought to be done to carry the cargo to its place of destination; and for that purpose the cargo owner should contribute to the expense as far as his interests may apparently require; but he is under no obligation to sacrifice his cargo, or to allow it to be sacrificed, for the benefit of the vessel alone. He ought to do what good faith towards the vessel demands, but need not do more. If he would lose no more by helping the vessel in her distress than he would by taking his property and disposing of it in some other way, he should, if the vessel owner or the master requires it, furnish the help or allow the cargo to be used for that purpose. To that extent he is bound to the vessel in her distress, but no further. When, therefore, a cargo owner finds a vessel, with his cargo on board, at a port of refuge, needing repairs which cannot be effected without a cost to him of more than he would lose by taking his property at that place and pay-

ing the vessel all her lawful charges against him, we do not doubt that he may pay the charges, and reclaim the property; otherwise he would be compelled to submit to a sacrifice of his own interests for the benefit of others, and that the law does not require."

These observations are as applicable to a case of stranding as to a case of reparations in a port of repair. They put an end to the supposition that the master has a right to make use of the cargo, to its palpable disadvantage, for the mere purpose of accomplishing the *voyage* with his own ship, when that is not necessary for the cargo. Mr. Justice STORY, also, in the leading case of *Insurance Co.* v. *Ashby,* 13 Pet. 331, 340, in reference to a case of stranding, long since said: "In truth it is the safety of the *property,* and not of the voyage, which constitutes the true foundation of general average;" which is the precise ground of the English decisions: *Svensden* v. *Wallace,* 13 Q. B. Div. 69, 72–75, 85, 91; *Hallett* v. *Wigram,* 9 C. B. 580. The master has no more legal right, therefore, to sacrifice the interests of the cargo for the purpose of floating a stranded ship, than of repairing an unseaworthy one; nor to inflict an unnecessary and injurious charge upon the cargo under the guise of general average, than in the form of bottomry.

Under the liberal view of the courts of this country, which regard as general average almost all extraordinary expenses in a port of refuge made necessary by sea perils, (*Hobson* v. *Lord,* 92 U. S. 397,) the corrective check of the principle so clearly stated in the recent case of *The Julia Blake* is essential, in order to prevent abuses and the sacrifice of the cargo to unreasonable expenditures by the master for the ship's benefit; and, in cases of disaster, to confine his authority to charge the cargo within the limits of its own interests and necessities. If disaster and the need of extraordinary expenditures are held to release the shipowner from the duty to repair at the ship's own cost, they must be held equally to relieve the cargo from any obligation to continue a manifestly disadvantageous association with the ship; and to put an end to the master's authority to hold the cargo longer to the ship, to the cargo's manifest prejudice; and to debar him also from undertaking any work on the cargo's account, or creating any charges against it, that are clearly opposed to its interests or its necessities. He may do acts contributing to the safety and interest of both, at the common expense. Beyond that, he has no authority to bind either for the other; and good faith forbids him to adopt any measure that will plainly inflict on the cargo a heavy expense for the ship's benefit, when he knows that all the interests of the cargo may be protected by separating it from the ship, and forwarding it to its destination by other means, at a comparatively small cost. This limitation, imposed by reasonable prudence and good faith on the master's power to charge the cargo, is intimated in the guarded language of Mr. Justice CLIFFORD in *McAndrews* v. *Thatcher, supra,* (page 368,) wherein the work referred to is supposed to be done "without much expense or delay." The same condition is elsewhere plainly expressed or implied. It is an implied qualification in every assertion of the master's duty to

complete the voyage. *Hallett* v. *Wigram*, 9 C. B. 580, 601; *Walthew* v. *Marrojani*, L. R. 5 Exch. 116, 121; *Goodwillie* v. *McCarthy*, 45 Ill. 186, 192.

The nature of the work of getting the ship off in this case was entirely distinct and separable from the work of unloading. There was not the slightest need of consolidating them, or of treating them as one. Both ship and cargo had a common interest in the latter; but the cargo had no interest in the former. The only work for the common safety or benefit was in discharging the cargo; and that work, therefore, is all that falls within the principle of general average. So far as the interests were distinct and opposed to each other, the expenditures for the benefit of each should be kept distinct. The charges for unloading must, therefore, be separated from those for getting the ship off. If the whole operation was "one continuous work," as respects the ship, it was certainly not so as respects the cargo. Nor was the whole work in this case any more "one continuous operation," so far as I can perceive, than in the case of *Job* v *Langton*, which in *McAndrews* v. *Thatcher* was approved. The subsequent measures here taken to float the ship were "new measures" as much as in that case, in the sense that they had nothing to do with unloading the cargo. General average rests upon the highest equity, and upon the essential facts of the case, not upon any fictions; and the principle that forbids sacrificing the cargo to the ship, forbids treating as one act a series of acts that have different objects in view, and, as respects expenditures, are perfectly separable, according to the interests benefited. The cargo is, doubtless, to be treated as a whole. The object of unloading in this case was in part to rescue the cargo itself from peril; and in part also to lighten the ship, so as to make hauling her off possible. But those were not the only purposes of unloading. It was equally done in order to make delivery of the cargo to the owners at once, without reference to the success or failure of the subsequent efforts to get the ship off. After unloading, the subsequent work of forwarding the cargo to its owners in no way concerned the ship or its safety, but the cargo and freight only; and the efforts and expenditures made in hauling off the ship in no way concerned the cargo. That the wrecking company did the whole work, or worked continuously, or that a part of the preliminary work for hauling off the ship was going on at the same time with the unloading, does not affect the essentially separate nature of the different parts of the work done, and the different objects in view; nor authorize any charge against the cargo for work that would plainly be of no benefit to it. The master in this case did precisely what according to the decision in *The Julia Blake* it was his duty to do, viz., he at once forwarded the goods to their owners by other means than by his own ship. He is not at liberty to say that he did not intend any separation of the cargo from the interests of the ship, and of her voyage; because, under the circumstances of this stranding, and the long delay and the heavy expense of floating the ship, plainly to be foreseen, he had no legal right to hold on to the cargo any longer on joint account, or for the accomplishment of the voyage by his

own ship, to the obvious sacrifice of the cargo. The unloading and delivery must therefore be construed as a complete separation of ship and cargo. Before the work was begun, many, if not most, of the underwriters were consulted; and it must be inferred, therefore, that the cargo owners generally understood that the delivery of cargo was to be made immediately, as their interests required it should be made. This rendered unnecessary any specific demand for such delivery on their part.

6. The case should be treated, therefore, as that of a separation of the interests of the cargo from those of the ship, made in accordance with the rights of the cargo owners by the master as their agent, and for their benefit, and in accordance with his own obligation under such circumstances; with the same effect as if done upon the cargo owner's demand. The ship sustains no injury and no hardship by this separation. She incurred no expense for the cargo's benefit except in unloading, and that expense the cargo shares. If the cargo had been worthless ballast, it must have been unloaded in the same way, as a preliminary to the work of getting the ship off. In paying all the subsequent expenses of floating her, the ship pays only what by the sea peril has fallen to her lot. As the voyage, so far as concerns the earning of freight, was substantially accomplished at the time of the stranding, and as the separation was made solely for the consignee's interest, the ship should be allowed her freight in full, as though the owners had demanded and received the cargo on the beach, or in lighters. The expense of unloading should be charged as general average against ship, freight, and cargo; because that expense was equally necessary for the safety of all, and was actually incurred for the benefit of all. Neither can be exempted from paying its share, on the ground of receiving an accidental or incidental advantage, (Carv. Carr. by Sea, §§ 398–400; Lown. Av. 4th Ed. 173;) since the unloading in this case was not an accident or a mere incident, as respects either the ship or the cargo; but was equally necessary to the safety of each, and was actually done for the benefit of each. The subsequent expenses on account of the cargo after it was discharged, either on the beach or into lighters, should be charged as particular average against the cargo alone; and the expenditures that had sole reference to hauling the ship off, against the ship alone. As the foundation of the claim is not the bond, nor the adjustment under it, but the expenses incurred for the cargo, which the bond merely protects, and sufficiently covers, whether they are general average or particular, it is not necessary to dismiss the cause by reason of the partially erroneous mode of adjustment. If the parties do not agree, a readjustment of the respondents' obligations may be had in accordance herewith, by the same adjuster, or by any other that may be agreed upon; and, on further report thereon, a decree may be entered accordingly.