RELIANCE MARINE INS. CO. v. NEW YORK & C. MAIL STEAMSHIP CO. et al.

(District Court, S. D. New York. September 4, 1895.)

1. GENERAL AVERAGE—FIRE IN HOLD—DAMAGE FROM SMOKE SPREAD BY STEAM PRESSURE NOT RECOVERABLE.

Fire being found in a cargo of hemp in the hold, steam was used to smother it; it was claimed that tobacco stowed aft of the after bulkhead was injured by the smoke forced aft by the pressure of the steam; the evidence was contradictory and inconclusive whether the tobacco aft was damaged by smoke; but there was no direct damage by steam

either in wet or dampness: *Held*, that the'cases in which damage from water used to put out fire is held to be general average were inapplicable, since the damage in this case was from smoke alone, which was a part of the fire; and no direct damage being done by the steam, a general average claim was not allowable for damage done through the undesigned and unavoidable spread of fire or smoke in the course of proper efforts to extinguish them.

2. SAME—SCUTTLING SHIP—LANDING CARGO—SUBSEQUENT EXPENSES—ON SEPARATION OF INTERESTS.

The master, on account of the fire, having put back to Havana, not being able to extinguish it either by his own efforts before arrival, or by the use of engines from the shore, scuttled the ship for the purpose of extinguishing the fire; before doing so, he hurriedly removed the libelant's goods, and the vessel was afterwards raised and the rest of the cargo was saved: *Held*, that the different means adopted to put out the fire constituted one unbroken series of operations, and that the removal of the libelant's goods, and the sending of them forward by another vessel of same line for the convenience of all parties, did not work any separation of interests, and was not so designed; and that the libelant's goods were chargeable for their proportionate share of the whole salvage operation.

This was a libel by the Reliance Marine Insurance Company against the New York & Cuba Mail Steamship Company and James E. Ward & Co., trustees, to recover compensation in general average.

Macfarland & Parkin, for libelant.

Wing, Putnam & Burlingham, for respondents.

BROWN, District Judge. The libelant having, as insurer, settled a loss on 221 bales of tobacco, arising from fire discovered on the steamship Seneca, when one day out upon a voyage from Havana, claims to recover compensation in general average, through subrogation to the rights of J. W. Fortier, the owner, on the ground that the damage to the tobacco was caused by the voluntary acts of the master in the effort to extinguish the fire. Upon a general average adjustment an allowance was made for damage to Mr. Fortier's consignment by water to the amount of $2,987.55 upon 64 bales; and this is so far satisfactory. But the libelant contends that all the rest of the bales were also damaged by smoke driven into the after compartment by the live steam let into the 'tween decks for the purpose of extinguishing the fire; and that the "stigma" upon the reputation of the tobacco, from being more or less tainted with the fumes of smoke,.or from association with a consignment suffering in that way, was such that its marketable .value was impossible to be ascertained except by an auction sale of the whole lot; and that the whole loss, as thus ascertained, amounting to $12,766.44, should be allowed to the libelant, though it settled with the owner for $8,000. The respondents contend that there was no damage from smoke; and that if there was, such damage, as well as that arising from "stigma" upon the reputation of such bales as were not physically damaged, is not recoverable in general average.

There is little dispute as to any of the facts, except as to the question whether the bales were damaged by smoke. Six witnesses engaged more or less in the tobacco business, who tried the tobacco by smoking it, testify that it was all so tainted with a smoky flavor

that its marketable value was greatly diminished. Three official experts of very large and long experience, who also carefully examined the tobacco, deny that there was any such taint or damage.

The fire was among bales of hemp stowed in the forward compartment of the hold. The tobacco in question was stowed with other bales of tobacco, to the number of 1,668 bales in all, in the upper 'tween decks aft of the after bulkhead. When the fire was discovered, the first attempts to extinguish it being unavailing, and the men being driven away by the heat and smoke, the hatches were closed, live steam from the boilers was let into the 'tween decks for about seven hours, and the ship put back for Cuba, where the tobacco was removed by lighters, and the ship then submerged. The after bulkhead was of wood, and proved to be not water-tight. It was about 100 feet aft of the place of the fire, and the intervening spaces along the sides of the engine room were stowed with hemp. Ventilators from these spaces ran up through the decks above. The general average allowance to the 64 bales was made for damage to those bales by water arising while lightering the cargo ashore for the purpose of flooding the ship. The other bales for which the additional damage is here claimed, showed no external signs of damage. They were covered with white canvas. When the hatches were opened to discharge the bales, no smoke or odor of smoke, or steam, or dampness was found in the after compartment; nor did the bales when discharged show any signs of wet or dampness, or any stains or discoloration upon the white canvas from either water or smoke. The libelant argues that the continuous pressure of 100 pounds to the square inch from the boiler for seven hours must necessarily have forced the steam and creosote into the after compartment, so as to affect the taste of so sensitive a substance as tobacco. The respondents contend that any such pressure would be infinitesimal against the bulkhead, as the steam was discharged through numerous small holes in the steam pipes into the large spaces of the 'tween decks, from which the ample open ventilators afforded instant relief for any pressure of steam; and that no steam combined with smoke could possibly have passed through the white canvas covering of the tobacco bales so as to affect the tobacco within, without leaving the smell of smoke in that compartment, and marks of smoke discoloration upon the white canvas, as well as marks of dampness from the condensation of steam; none of which were found.

In order to establish a claim to general average in this case, it is not enough to show that the tobacco was affected by smoke; the damage must also be clearly traced to the voluntary act of man, as its true and proper cause. For as damage from fire is particular and not general average, so damage from smoke, as the effect and incident of fire, is also particular average only, unless, indeed, the fire or the smoke and the damage from it, were voluntarily produced for the common safety, or were caused solely by acts done for the common good. Here not only is there very great doubt whether the tobacco was tainted by smoke at all, but if it was, the smoke was an incident of the fire, and caused by the fire, and not by the act of man. No damage, I mean no direct damage, arose from the steam,

even if any steam penetrated to the after compartment; there were not even any signs of the presence of steam there at all. The damage, if there was any, was done by smoke alone; and the smoke was not produced by the steam, but by the fire in the hold; and neither the fire, nor the smoke, nor the presence of smoke in the after compartment, if any got there, was the voluntary act of man. If the smothering of the fire by closing the ship's hatches, or by forcing water or steam upon the fire, temporarily increased the smoke, the fire was none the less the true and original cause of all the smoke, and hence of all the damage it may have done; and this damage, if there was any such damage, must be classed with fire damage, as particular average and not as general average, because done by smoke alone, as an incident of the fire, and not by the steam voluntarily employed to extinguish it.

In this respect the case is wholly different from damage done by water used in extinguishing a fire. There the damage is done directly and wholly by the new agency voluntarily employed to put out the fire for the common benefit. Here the steam, the new agency employed, of itself did no damage.

Nor do I think that the circumstance that the steam may have contributed to the penetration of the smoke into the after compartment, if it did penetrate, as the libelant claims, is sufficient to make the smoke damage, if there was any, a voluntary sacrifice for the common benefit, like damage by water in the cases just referred to.

No analogous case has been cited in which damage from smoke alone, or from fire alone, has been made general average, merely because the voluntary act of man in endeavoring to extinguish the fire may have temporarily contributed to the spread of either fire or smoke, and thereby have given rise to some incidental damage. Yet often in fires on shipboard, these results, I apprehend, must to some extent arise. Often the first efforts to extinguish a fire give it breath and extend the flames or smoke to articles before untouched. That is an unavoidable result of the endeavor to put out the fire. But damage thus arising is not a voluntary sacrifice giving rise to a general average claim. And similar is the damage arising from any unavoidable spread of smoke by the use of steam.

The measures taken to extinguish a fire are to be looked at as a whole, and in all their relations. If in the whole series of connected measures damage arises from any new agency employed for the common benefit, it is placed to the account of general average, as was done in this case with the water damage arising to the 64 bales during the discharge by lighters for the purpose of submerging the ship. And similarly, the fire, as the original cause of the smoke, must be treated as a whole, and as including whatever damage may arise from the fire or the smoke during all proper efforts made to extinguish them.

Indeed, it is only by treating each as a whole, viz., the fire on the one hand, and the efforts to extinguish it on the other, that any claim to general average could arise. If the use of the steam in this case were regarded separately, i. e., apart from the subsequent return to port and the flooding of the ship, no general average claim could arise; because the use of the steam alone was not successful

in extinguishing the fire, or in saving the adventure. It did no more than to suppress the fire until arrival in port, where the tobacco could be discharged and the ship flooded; and it was by the latter acts that the adventure was finally saved.

I cannot find any support for the contention that the spread of fire or smoke damage incidental to proper efforts to extinguish the fire, gives rise to general average demands; and on principle it seems to me such damage must be excluded, because arising unavoidably from the nature of fire and smoke, and because done by them alone in the course of proper efforts to extinguish them. Only where the damage is done by the agency employed to extinguish the fire, as in cases of water damage, can the damage be deemed a voluntary sacrifice.

Again, if the fumes of smoke in this case reached the after compartment along with the steam, how can it be told how much of this result is due to the natural penetrative force of the smoke, and how much to the assistance of steam pressure; or whether less smoke, or no smoke at all would have reached that compartment by the time the hatches were opened, notwithstanding any probable extension of the fire, had no steam been employed? It is impossible to answer such questions; and without some satisfactory determination of them, I do not see how any allowance of general average, or the application of the principle contended for by the libelant, could properly be made; for as all this damage, if there was any, was done by smoke, the use of steam could not in any sense be said to have caused this damage, if on the whole there would have been as much smoke damage without the use of steam, as with it. The means being proper to extinguish the fire, the presumption is that the effect was beneficial, and the fire damage less than would have been suffered without it by every part of the cargo.

The rule allowing general average claims for damage done directly by any new agency voluntarily employed to save the adventure, is not subject to any such difficulties. Such damage, so far as it is definite, tangible, and traceable to the new agency alone, is liberally regarded as a sacrifice for the common benefit. Damage from smoke, though the smoke may have been temporarily but unavoidably extended by the proper employment of steam in extinguishing the fire, seems to me not of that character; nor is damage by "stigma" i. e., damage to the reputation of bales not physically injured, because other bales of the same consignment were injured, of such a nature as entitled them to a general average compensation.

The libel is, therefore, dismissed, with costs.

---

### On Motion for Further Hearing.

(October 22, 1895.)

On a motion for a further hearing the libelant contends that in the general average adjustment no charge should have been made against the libelant's goods for expenses incurred in raising the ship that was scuttled in order to put out the fire, after the libelant's part of the cargo had been removed, but that the charges should be

confined to the expenses of the previous salvage efforts. This part of the cargo was forwarded from Havana to New York, its destination, by the carrier, by means of other vessels of the same line by which it was shipped. It was never surrendered to other carriers, and was expedited for the convenience of all parties, and cannot be held to have been designed to be separated from the original adventure.

The case of L'Amerique, 35 Fed. 835, and the various cases there cited in support of the libelant's contention, differ from the present in this fundamental distinction: That there the expenses of raising and getting the ship off arose from stranding, a sea peril; while here the expenses of raising were the consequence of the voluntary act of scuttling the ship, which was done, and necessarily done, to put out the fire. This was itself a general average act; and it was merely the last of a series of measures taken by the master for the safety of the ship and whole cargo, from the time when he put back towards Havana, after he found that he could not put out the fire at sea with the appliances at hand. For more than 24 hours the master had been endeavoring to extinguish the fire by other means, but without success. When he found it was necessary to scuttle the ship, he hurriedly removed as much of the cargo as possible, including the libelant's goods here in question. The libelant contends that a separation should be made in the general average adjustment, at the point where the libelant's goods were removed from the ship, so as, in effect, to make two average adjustments, excluding, as against the libelant, all expenses after the goods were taken off the ship, on the ground that after they were once removed, they had no longer any interest in the fate of the ship, or the rest of the cargo.

The point raised seems to me to be expressly covered by the language of the supreme court in the case of McAndrews v. Thatcher, 3 Wall. 347, 370, 371, as follows:

"Not a doubt is entertained that if the master had been successful in saving the ship as well as the cargo, the whole expense, inasmuch as it was the result of one continuous, unremitted operation, would have been properly regarded as a general average expenditure. * * * Where the whole adventure is saved by the master, as the agent of all concerned, the consignments of the cargo first unladed and stored in safety are not relieved from contributing towards the expenses of saving the residue; nor is the cargo, in that state of the case, relieved from contributing to the expenses of saving the ship, provided the ship and cargo were exposed to a common peril, and the whole adventure was saved by the master in his capacity as agent of all the interests, and by one continuous series of measures."

But it was also there held that if there had been a break and abandonment of the original series of operations, and a subsequent commencement of a distinct salvage operation, which could at that point only benefit a portion of the property already in safety, the latter property should not be required to contribute towards the expense of this second distinct undertaking.

Here the series of measures was continuous and constant. There was no break or abandonment at any stage of the operations. I do not find any subsequent adjudications incompatible with the above, and I must, therefore, follow it in this case.

Motion denied.