### THE CASEY.

### HILLS BROS. CO. v. UNITED STATES.

District Court, S. D. New York.
March 25, 1930.

Bigham, Englar, Jones & Houston, of New York City (M. P. Detels, of New York City, of counsel), for libelant.

Charles H. Tuttle, U. S. Atty., of New York City (Walter Schaffner, of New York City, of counsel), for respondent.

WOOLSEY, District Judge.

The other exceptions having been withdrawn, my decision in this case is that the exception that the libel fails to state a cause of action in general average must be sustained, and as this is a test case and by stipulation the parties have put all necessary documents in evidence, I dismiss the libel with costs.

The Hills Brothers Company, the libelant herein, was at the relevant times the owner of 650 skeletons of figs which were shipped aboard the steamship Casey, a common carrier, at Smyrna on September 10, 1922, to be carried to New York.

A bill of lading was issued for these goods which, among other provisions, contained the following clause: "General Average shall be payable in accordance with York-Antwerp rules 1890 (except Rule I) and Antwerp rule 1903 and as to matters not therein provided for, in accordance with the laws and customs of the port of New York and all adjustments shall be drawn in New York by average adjusters appointed by the shipowners."

On October 22, 1922, whilst in the Eastern Mediterranean Sea en route from Smyrna to New York, the Casey struck a rock in a thick fog, was damaged, and put into Malta as a port of refuge. There she was dry-docked with her cargo aboard and the damage which she had suffered was found to be so serious that permanent repairs were necessary. The libelant's figs were kept aboard the Casey until November 17, 1922, when they were discharged and transshipped to the respondent's steamship Ossa, which took them to New York City, where they were delivered.

Nothing appears as to the voyage of the Ossa, nor is any complaint made against the respondent in respect of her handling of the figs.

On delivery at New York City the figs were found to be seriously damaged by decay. This decay is claimed to have been the direct consequence of the prolongation of the voyage resulting from the general average act of the master of the Casey in putting in to Malta and staying there for repairs. There is not any allegation that the master or owner of the Casey was guilty of any breach of duty owed to the figs whilst at Malta.

The United States as owner of the Casey arranged to have a general average stated at New York City, the port of destination of the adventure, by Messrs. Mather & Company, average adjusters.

The libelant, Hills Brothers Company, put forward for allowance in the general average, a claim in the sum of $11,368.96— the amount of the damage suffered by reason of decay in the figs, which is alleged to have been due to the prolongation of the voyage caused by the general average act above mentioned.

The adjusters refused to include this claim for deterioration in the general average statement.

By the York Antwerp Rules 1890, the base of general average sacrifice has been broadened to include expenses at the port of refuge and damages to cargo incident to its necessary discharge at such port. These rules, which are made by the bill of lading to govern this case, are, however, silent on the subject of deterioration of cargo due to delay at the port of refuge.

The question arising here must, therefore, be dealt with as one wholly unaffected by any conventional rules.

The right of recovery in general average is not based on any express contract, but arises, I think, in this wise:

The common agency of the master acting for the benefit of all parties in the adventure creates certain situations in which it is allowed to the person whose property has been sacrificed for the benefit of the adventure to recover ex æquo et bono—under analogy to the common counts—his own loss less what he himself should equitably contribute to the common loss, for the coadventurers must in any equitable adjustment share proportionately the loss involved in the sacrifice.

The rights arising as the result of a general average act must therefore be regarded as a bundle of equities. In such a situation in order that the owner of part of the common adventure may shift a portion of his loss due to sacrifice for the common good, his equity must clearly outweigh the equities of his coadventurers who through the average adjusters may seek to resist his claim.

We cannot in a case of this kind, therefore, get help from ordinary cargo damage analogies.

The predominant consideration in. approaching what is essentially an equitable claim as that here involved is to determine whether the nature of the damage is exclusively integrated with the general average act; for any damage not so integrated must necessarily fall outside the equity. Deterioration from decay I do not think is so integrated.

It seems to me that what I may for convenience call the ambit of a general average act is too narrow to include deterioration of cargo, for it embraces only damages to cargo which are *solely* attributable to the general average act—damages which could not have occurred except for that act.

It may be alleged, as it is in this libel, that the deterioration of the cargo was due to the delay at the port of refuge, but all men know that delay does not *cause* decay, although it may be the occasion owing to which decay occurs.

Here if the same amount of delay had been due to head winds, the same amount of decay probably would have followed.

This shows that the general average act, while contemporaneous with a part of the process of decay, was not the cause of it.

Recovery for damage by deterioration or decay of a perishable cargo due to delay is always based on fault in caring for it or on some other breach of the contract of carriage.

Proceeding to a port of refuge on an occasion when the master justifiably considers it necessary to do so for the benefit of the adventure committed to his charge, is not a fault, but a duty, under well-settled doctrines of a maritime law.

There might, of course, be acts of negligence in caring for the cargo after arrival at the port of refuge, but there is not any claim here of any such negligence.

The libelant in this case, therefore, seeks its recovery without being able to make out any breach of duty on the part of the master or owner of the Casey.

Deterioration and decay of commodities is due to some inherent vice, bacteriological or parasitical. When that process first becomes active in any commodity is probably not discoverable except by more or less elaborate experiment. Possibly it begins to act when the cargo is first packed or shipped and continues progressively until it is delivered and consumed by man or in the arts.

One shipment of perishables may be shipped in such an early stage of this process as not to be damaged on delivery, whilst another may have been shipped at a more advanced stage of the process, and may, unless the voyage proceeds without interruption, be found to be damaged beyond use on its delivery.

For the reason that perishable cargoes thus carry implicit in them the seeds of their own destruction, the damage resulting from such a process as I have mentioned is usually and appropriately considered to be for the account of the owner of the goods.

Where, in a c. i. f. contract, goods decay in transit without fault involved, the loss falls on the buyer. Bowden v. Little, 4 Commonwealth (Australia) 1364; and see also Williston on Sales, § 280, p. 408, footnote edition of 1909.

The Harter Act frees the shipowner from liability for damage due to inherent defect, quality, or vice of the thing carried. Act of February 13, 1893, § 3 (46 USCA § 192). This principle is recognized throughout all modern legislation by ship-owning countries. See Temperley on The Sea Carriage of Goods Act (1924) 3d Edition, pp. 94, 101, Appendix A; Scrutton on Charter Parties and Bills of Lading (12th Ed.) pp. 501, 523, 526, 529.

It cannot be equitable that a shipper of perishables, whose process of deterioration are at his own risk, should be able to foist his loss from deterioration on others who have not been guilty of any actionable wrong to him.

Moreover, there is a practical difficulty, even if all others are laid aside. For fairly to base a recovery for deterioration or its equivalent in general average, it must somehow be made clear just how much of the deterioration is due to the general average act. In case of deterioration this cannot be clear, for one must remember that the condition of the decay process is practically impossible to chancer at a port of refuge. Cf. Reliance Marine Ins. Co. v. N. Y. & Cuba Mail S. S. Co. (C. C. A.) 77 F. 317, 319, 320, affirming (D. C.) 70 F. 262, 266.

Gourlie, in his classical work on General Average, says of damage to cargo at port of refuge, at page 214:

"The allowance for the damage is made on the ground that the discharge and consequent damage was a natural and foreseen

result of the voluntary bearing away; this being a general average act, all losses and damages a sequence thereto, and directly consequent upon such deviation, must be likewise entitled to compensation.

"Hence, deterioration arising through delay, change of climate, wastage, etc., this not being consequent upon the discharge (for the same influences would have prevailed had the cargo been retained on shipboard), is not contributed for.

"It may appear difficult to reconcile the rejection of such losses with the principles underlying this whole question, and there is a certain amount of equity in the claim, but it is considered necessary, in practice, to find some point at which a line must be drawn; great difficulty would occur in the separation of damage clearly arising from delay, from such as had already occurred on the voyage. * * *

"The climatic effects are often very injurious; but where such injury would probably attack cargo on board as well as that unloaded, no contribution would be due. Wine sours by detention in a warm climate; gambia hardens and cakes and is injured by exposure to the air. Effects not produced directly by the discharge, but simply the combined results of time and climate, seem, like loss of interest or market, or injury by conversion of a summer voyage into a winter one, etc., etc., not to be entitled to general average compensation."

The conventional attitude in dealing with general average is thus to group together resulting loss of interest or market and deterioration. Cf. Spafford v. Dodge, 14 Mass. 66, 74, 79.

It is true that none of these losses are included in general average, but the reasons for the exclusion are, I think, different. Delay resulting in loss of interest or market is spread throughout the whole adventure, and its results are automatically *prorated* over all the interests, whilst deterioration is peculiar to the individual shipment.

The only case in this country which really touches the question here involved is mentioned by Gourlie and supports the views which I have expressed. That is Bond v. The Superb, Fed. Cas. No. 1624, 1 Wall. Jr. 355, decided by Mr. Justice Grier sitting on circuit in Philadelphia in 1849.

The question there arose out of a voyage from Palermo to Philadelphia with a cargo composed in part of tropical fruits. Owing to bad weather, the carrying vessel put into St. Thomas, where it was found necessary for the general safety of the ship and cargo to repair her, and in order to do this to unload and reload part of the fruit. When the fruit arrived at Philadelphia, some of it was found good for nothing, and plaintiff contended that the loss had been caused either in whole or in part by the act of unloading, etc., which was necessary for the general welfare, and made claim in general average. To what extent the fruit had been injured by the operation at St. Thomas was not clear, but it appeared, rather, that the decay had *commenced* before its removal, and that the motion and delay consequent upon that act had accelerated and increased it.

Mr. Justice Grier agreed with the District Court that the evidence was insufficient to sustain the claim under any assumption of law. But as the testimony was contradictory the question was argued and rested in both courts upon the law also.

As to the law applicable, Mr. Justice Grier said, Bond v. The Superb, Fed. Cas. No. 1624, 1 Wall. Jr. at page 356:

"Where goods are liable to loss or deterioration which arises solely from an inherent principle of decay or corruption, the owner cannot claim for general average, notwithstanding the delay of the vessel in the port of necessity, may have added greatly to that deterioration. And this for two reasons: (1) Because there would be no equality between the owners of perishable goods and those not perishable; and (2) because the immediate cause of damage is what the French writers term the 'vice propre' of the article, and not a damage incurred or sacrifice made either intentionally or incidentally for the safety of the whole. And perhaps a third reason might be added, to which the facts of this case would seem to give weight, and which has caused the memorandum clause in policies of insurance: I mean, because such commodities carrying within themselves the seeds of deterioration, it is difficult, if not impossible, to discriminate the partial injury induced by inherent causes, from such as might arise within the risks undertaken.

"It is true, that where the direct and immediate cause of the damage to perishable articles, is some act done for the general preservation, the owner would have the same right to claim for general average, as if the goods had not been in their nature perishable. Such a case is found in Maggrath v. Church, 1 Caines (N. Y.) 196, 214 [2 Am. Dec. 173], where the damage sustained by

some corn was occasioned by water that got upon it, 'in consequence of the cutting away the mast of the vessel for general preservation;' and thus the immediate cause of the damage was not the vice propre of the grain, but water which had got upon it by cutting away the mast. The circumstances of the case before us are different. No direct injury was received by the fruit in consequence of unloading and reloading it. The decay of the fruit had commenced before its removal; and assuming that its removal did accelerate and increase the natural progress of decay more than its pitching in the hold of the vessel would have done, still it could hardly be said that the removal was the proximate cause of the decay, and not the vice propre of the fruit. Yet it is the proximate cause to which the law looks. 'It were infinite,' says Lord Bacon (Maxims of the Law, Regula 1) 'for the law to judge the causes of causes, and their impulsion one on another. Therefore it contenteth itself with the immediate cause, and judgeth of acts by that, without looking to any further degree.' Now, if the mere delay which would undoubtedly increase the damage of these perishable articles when it had once commenced, is no reason why the damage whose immediate cause is the vice propre, should not be brought into general average, we can see no reason why the removal which may have increased, not caused the injury, should have a different doctrine applied to it."

The French case of Northern Steamship Co. v. Cappin, Revue de Droit Maritime Compare, vol. 3, p. 371 (1893), is the only decision tending to support the libelant's contention. There the Cour de Requete, a branch of the Cour de Cassation, to which is delegated the allowance of appeals, refused to grant an appeal from the Court of Appeals at Douai which had sustained an allowance in general average for deterioration of a cargo of herring due to detention in a port of refuge. In that case there was apparently also involved some question as to whether the captain was negligent in not sending the cargo forward sooner.

Comments on the decision in the same copy of the Revue are very hostile to the doctrine supposed to have been laid down, and the commentator's criticism is supported by many references. Cf. Revue de Droit Maritime Compare, Vol. III, pp. 378, 384.

In view of the fact that there is not any doctrine of stare decisis in France, and of the severe criticism of this decision, it can hardly be considered as settling the law of France. In any event, the decision does not represent the law elsewhere.

None of the other cases cited by the libelant is in point.

In Anglo-Argentine Live Stock & Produce Agency v. Temperley Steam Shipping Company, Limited, [1899] 2 Q. B. 403, an order of the Board of Agriculture made it illegal to land cattle alive in England if the steamer conveying them touched a Brazilian or continental port. The Edenbridge sailed from Buenos Ayres for Deptford, England, with a deck cargo of live cattle. She developed a leak whilst off the coast of Brazil and was forced to take refuge in Bahia. That made it impossible for her to go to England, and thus frustrated her adventure. Mr. Justice Bigham allowed as a recovery in general average the loss involved in the sale of the cattle at Antwerp whither the Edenbridge was diverted solely on the ground that it was the direct result of the general average act.

In Brandyce v. United States Lloyds, Inc., 207 App. Div. 665, 203 N. Y. S. 10, the question involved was merely that of proximate cause in an action on an insurance policy.

The reason why the libel must be dismissed is thus seen to be that equity, on which general average is based, revolts at the idea that the owner of a commodity with an idiosyncrasy which tends to make it decay or deteriorate should, without being able to fix fault on any one concerned, have an allowance made to him in general average for the working of a natural law inherent in the commodity which he has shipped.