986

## THE HERANGER.
### No. 22283.

District Court, N. D. California, S. D.
Oct. 15, 1937.

Derby, Sharp, Quinby & Tweedt, of San Francisco, Cal., for libelants.

Lillick, Olson, Levy & Geary, of San Francisco, Cal., for respondents and claimant.

ST. SURE, District Judge.

Libel for damages to cargo of bananas shipped on the Norwegian Motorship Heranger from Balboa, Canal Zone, to Los Angeles or San Francisco.

On April 23, 1936, preceding delivery of cargo and bill of lading, letters were exchanged between the parties regarding the shipment. Libelants' letter was accompanied with instructions for temperature to be maintained during the voyage; the pertinent part of which reads as follows: "Precool to 46 degrees Fahrenheit. When bananas are loaded the delivery temperature should be 52 degrees until the return temperature is 56 degrees (approximately 20 hours) thus removing the natural heat of the fruit. * * *"

On April 28, 1936, Elliott Shipping & Land Company, Inc., a corporation, for account of libelants, delivered to the Heranger 6,184 stems of bananas at Balboa, Canal Zone, for transportation to Los Angeles or San Francisco. The bill of lading showed receipt of the cargo "in apparent good order and condition." The ship and cargo arrived at San Pedro on May 8th, when, it is claimed, the bananas were found to be "damaged to an extent which rendered them unsalable as first-class fruit."

Libelants contend that the letters and the instructions constitute a specific contract, guaranteeing certain temperatures to be maintained in the hold of the ship where the cargo was stowed, which contract respondents failed to keep. Respondents rely upon the provisions of the Harter Act, § 3 (46 U.S.C.A. § 192), contending that they are not responsible for damage or loss resulting from any inherent defect, quality, or vice of the thing carried.

It is admitted that the vessel was seaworthy, the cargo properly stowed, and the refrigerating apparatus in good order. The entire controversy centers about the temperatures agreed to be maintained on the day of loading at Balboa and immediately thereafter, as shown by the following colloquy between the court and proctor for libelants:

"The Court: Then the whole question is whether there was proper ventilation in the ship during the trip from Balboa to Los Angeles?

"Mr. Quinby: My chief objection in this case, your Honor, is to the care of the bananas at the time of loading and immediately thereafter with regard to the delivery of the temperatures which were required by contract to be maintained and which were not maintained.

"The Court: You mean the delivery temperatures at the time of the loading of the bananas at Balboa?

"Mr. Quinby: Yes, your Honor. Of course, I reserve any objection that I may have to the failure of the ship to carry its burden of proof as to exceptions and things of that sort. So far I have no particular objection to the machinery of the ship. As a matter of fact, Mr. Charles allowed me to crawl all over it yesterday and I found nothing wrong with it. So far as the entries in the log from day to day after the ship left Balboa, they seem to have been in accord with the instructions. Of course, while they have not been completely proved, I think I will not require Mr. Charles to call the other two watches to make that proof. I think I will stipulate with Mr. Charles regarding that.

"The Court: Then that narrows the issue considerably.

"Mr. Quinby: That is what I wish to do, your Honor. * * *"

J. Scott Rider, salesman for libelants, testified in their behalf. He has been in the business of importing bananas for 25 years, and arranged for the shipment in question. He was in Los Angeles when the cargo arrived there. He saw the discharge of a portion of the bananas and considered the fruit in poor condition. "The condition was ripe, turning, and apparently heated," said the witness. By "ripe" he meant "fully ripe"; by "turning" he meant "where the color is beginning to show turning from green to yellow"; and by "heated" he meant the process of ripening had begun. The fruit was not decayed in any sense, but witness considered it unmerchantable.

Bananas are never allowed to ripen on the plant, but are cut for shipment when "dead green." If left on the plant, the fruit will burst before ripening.

Witness gave no particular instructions for cutting. But there is a standing instruction, "they shall be of good quality, which refers to scarring, etc., and they shall be of a grade and maturity which will not be too full to carry safely on a length of trip of eight days, or ten days, or twelve days."

"Q. Would you state what you mean by that they shall [not] be [too] full? A. I mean by that in growing bananas, well, you might say they are thin, and if they are left on the tree an improper length of time, they will burst open. There is a point at which it is the proper time to cut them so they are in good and proper shape to make the shipment."

"Q. Mr. Rider, about how long would you say it would be proper to cut the bananas before shipment for a trip such as the Heranger engaged in from Balboa to San Pedro and San Francisco? A. The shortest period possible."

The witness had heard frequently of bananas that had been cut 80 hours, but he did not believe in that length of time; "60 to 65 hours, possibly 70 hours would be safe, preferably a shorter time."

The deposition of Ralph Robert Beardsley was taken on behalf of libelants. Beardsley was employed as a banana inspector by the Elliott Shipping & Land Company, Inc. He had had 12 years' experience, having theretofore inspected possibly 1,000 shipments. He inspected the fruit in question. The bananas were loaded on April 28, 1936, between the hours of 7 a. m. and 4:30 p. m. The bananas were in good condition. The temperature at time of loading was 87°; it was hot and sultry. At the time of loading the temperature of the hold in which the fruit was stowed was cooler than the air outside. Before loading 150 stems were rejected because they were overripe, 25 because they were spotted, 100 because they were bruised, and 22 because of other conditions.

"Q. What do you consider a reasonable time to bring down the temperature of bananas to the carrying temperature so as to guard against injury to the fruit by too quick a change of temperature? A. This depends entirely upon the temperature of the chambers when the doors are closed, but I should say from 20 to 24 hours." "Our reports show that at 7 a. m. on the morning of April 28th this fruit had an average age of 45 hours."

Libelants' answers to respondents' interrogatories show that "these bananas were cut between the hours of 6:00 A. M. and noon on April 26, 1936; the fruit, after being cut, was placed on the riverbank and covered with leaves; it was later loaded in small boats and covered with fresh cut green leaves and transported down the river to El Real. From El Real to Balboa fruit was transported by small motor ships. In such ships the bananas were loaded both in the hold and on deck. In the hold ventilation was given by removal of sections of the forward and after hatches. On deck the fruit was protected by a covering of fresh green leaves." "We are unable to state the exact temperature at the time of cutting, but it probably ranged from 78° to 88°. We do not know the mean temperature on April 26 and April 27, 1936. The temperature at the wharf while loading at Balboa was 87°."

Libelants rely upon the fact that the cargo was delivered to the ship in apparent good order, and that they had a specific contract to maintain certain temperatures during the voyage, which was breached. The issues in the case having been narrowed, it is necessary to consider only the temperatures maintained at the time of loading and immediately thereafter; the nature of the cargo, its characteristics, and perishability.

The refrigerating log shows that when the hatches were opened for loading at 10

o'clock on the morning of April 28th, the "in" and "out" temperatures in the hold registered 36°. Thereafter it raised to 47° "in," 50° "out," and continued to rise slightly until the hatches were closed at 7:45 in the evening, when it reached the temperatures of 62° "in" and 70° "out." The instructions called for a delivery (in) temperature of "52° until the return temperature is 56° (approximately 20 hours),, thus removing the natural heat of the fruit." According to the testimony of the chief engineer of the ship and Mr. Fuhrbery, an expert for respondents, it would be impossible for the ship's refrigerating apparatus to maintain a temperature of 52° with the hatches open on a hot tropical day. The apparatus could not maintain such temperature and circulate air. At the time of loading, while the temperature surrounding the ship was 87°, in the hold at its highest it was only 62°. The temperature of 52° intake called for by the instructions was reached in about 18 hours. After the hatches were closed it took about 24 hours for the exhaust air from the hold to be reduced to approximately 56°.

Libelants, through an expert witness, called attention to the fact that the log shows that during the 10 hours when the hatches were open the compressor of the refrigerating apparatus showed a reduction of about 30 revolutions a minute out of 362. According to the expert this would reduce the "over-all production" of the plant, roughly 10 per cent. Respondents' expert testified that a 10 per cent. reduction of revolutions, under the conditions present, would make no appreciable difference in the temperature, which opinion seems reasonable.

The chief engineer of the ship testified that the Heranger had previously carried cargoes of bananas on 10 or 12 trips, and that upon each occasion the "out-turn of the bananas was good."

Bananas are a perishable commodity. "They shall be of a grade and maturity which will not be too full to carry safely," testified libelants' witness Rider. "There is a point at which it is the proper time to cut them," continued the witness, "so they are in good shape to make the shipment."

They should be shipped as soon as possible after cutting. If the fruit has turned or is turning from green to yellow upon arrival at port of destination, it will be rejected by the trade and can be sold only to peddlers, presumably at a loss. "By our United States * * * grades as to carriage and firmness," said witness Fuhrbery for respondents, "we run from hard green, hard light green, firm, less than firm, ripe, and dead ripe." The best carrying grade is the hard green.

The master of the ship testified that he had a conversation with libelants' witness Rider about the cargo when it arrived at San Pedro. Rider estimated the cargo had been damaged 25 per cent. "Mr. Rider mentioned to me," said the master, "if he had any more shipments on the Heranger then he would ship some—I don't remember what he called it—some thinner bananas." Thin fruit would be in the hard green grade.

The fruit was cut probably in an advanced state of maturity 2 days before loading. It was placed on the riverbank and later transported to the ship in small boats under the hot rays of a tropical sun. The fruit was too far advanced to permit of a 2-day preloading period and an 11-day voyage. Under the facts disclosed by the evidence and those of which the court may take judicial notice, such as the perishability of the cargo, "implicit in it the seeds of its own destruction," it is probable that the condition of the fruit upon arrival at port of destination was attributable to its inherent defect or quality, rather than to wrongful acts of respondents. Cf. The Casey (D.C.) 39 F.(2d) 136.

As a contributing cause to ripening, the slight variations of temperature disclosed by the log were negligible when compared with the heat of the tropics prior to and on the day of loading. Cf. Demarara, 1934 A.M.C. 54.

It would be inequitable to hold respondents liable for any loss resulting to the cargo under the circumstances.

Ordered that libelants take nothing and that respondents have judgment for their costs.