## THE HERANGER.
### No. 8889.

Circuit Court of Appeals, Ninth Circuit.

Feb. 14, 1939.

Rehearing Denied April 12, 1939.

Herman Phleger, Maurice E. Harrison, Howard J. Finn, Gregory A. Harrison, M. B. Plant, and Brobeck, Phleger & Harrison, all of San Francisco, Cal., for appellants.

Ira S. Lillick, Lillick, Olson, Levy & Geary, and Allen Charles, all of San Francisco, Cal., for appellees.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

GARRECHT, Circuit Judge.

Appellants, libelants in the court below, filed a libel against the Norwegian Motorship "Heranger," her tackle, apparel and furniture, and Westfal-Larsen & Co., A/S, a corporation, respondents and appellees, for damages to a cargo of bananas shipped on appellee vessel from Balboa, Canal Zone, to Los Angeles and San Francisco, California.

The libel is in the form usually employed in cargo damage cases, alleging delivery to the vessel in good order and condition, a promise to re-deliver in like good order and condition, and discharge in a damaged condition.

The respondents filed a joint answer in which they denied the allegations mentioned in the preceding paragraph and set up six affirmative defenses. One of these defenses merely defined the measure of damage to be applied and is of no consequence upon this appeal. Of the remaining five, two were predicated upon section 3 of the Harter Act, 46 U.S.C.A. § 192, one pleading it directly and the other pleading a bill of lading provision incorporating the statutory exceptions. The remaining three pleaded bill of lading provisions which, in substance, relieved the vessel of liability for damage resulting from condition of the goods upon delivery to the vessel or inherent vice.

On April 28, 1936, Elliott Shipping and Land Co., for account of appellants, delivered to the "Heranger" 6,184 stems of bananas at Balboa, Canal Zone, for transportation to Los Angeles, or San Francisco, the choice of such ports of destination being at the option of appellants. When the bananas arrived at Los Angeles, they were examined by an agent for appellants, one J. Scott Rider, and found to be in poor condition and unsalable as first class fruit, due, as alleged by appellants, to the fault of appellees.

From the evidence presented the following appears:

Appellants entered into an agreement with Elliott Shipping and Land Co., whereby the latter was to supply the former with bananas and as part of the arrangement Elliott Shipping and Land Co. was to load the bananas on the "Heranger."

In connection with the carriage of these bananas Mr. Rider, the agent for appellants, gave instructions to the Steamship Corporation relative to the temperatures to be maintained during the shipment, which were attached to a letter dated April 23, 1936, and which were as follows:

"Precool to 46 degrees Fahrenheit. When bananas are loaded the delivery temperature should be 52 degrees until the return temperature is 56 degrees (approximately 20 hours) thus removing the natural heat of the fruit. Then raise delivery temperature to 53 degrees and watch returns carefully. If return temperature reduces to 55 degrees the temperatures are correct; if however, the return temperature does not

come down to 55 degrees the delivery temperature should be reduced to 52 degrees until the return temperature has settled to 55 degrees for 12 hours. Delivery temperatures can then be raised to 53 degrees and maintained if returns show 55 degrees or as low as 54 degrees. This above is not to be accomplished by excessive fan speeds.

"The carrying temperature throughout the remainder of the voyage should be 53 degrees for delivery temperature and 55 degrees, or as low as 54 degrees for return temperature."

These instructions were cabled by the Steamship Corporation to the Master of the ship through its agent in the following form: "Instruct Heranger on arrival Cristobal precool to 46 Fahrenheit maintain intake temperature during loading 52 continue this until outlet after about 20 hours is 56 then increase intake to 53 until outlet 55 but if not reached reduce intake again to 52 until outlet is 55 for 12 hours then increase intake to 53 maintaining 55 or lowest 54 outlet thereafter."

The bananas were cut on April 26, 1936, between the hours of 6 A. M. and noon by Elliott Shipping and Land Co., placed on the river bank and covered with leaves. Later, the fruit was loaded in small boats and covered with fresh cut green leaves and transported down the river to El Real. From El Real to Balboa the fruit was transported by small motorships, being loaded both in the hold and on the deck. Ventilation in the hold was afforded by removing sections of the forward and after hatches. On deck, the fruit was protected by a covering of fresh green leaves.

The motorships were brought alongside the boat landing at Balboa at 6:30 A. M., April 28, 1936. The fruit was then placed on land, trucked to the "Heranger," brought on board and stowed. Loading was commenced at about 7 A. M. The interval between the cutting and stowing of the bananas, as variously estimated by different witnesses, ranged from 52½ to 61¾ hours. The temperature at all times was very high, on the two preceding days it ranged from 78 degrees to 88 degrees, and on the day of loading it was hot and sultry and the temperature at the wharf in Balboa was 87 degrees.

Loading of the bananas on the "Heranger" took place under the direction of Ralph Robert Beardsley, employed as a banana inspector by Elliott Shipping and Land Co. According to his testimony (taken by deposition) the bananas arrived at Balboa in good condition excepting some 297 stems thereof which were rejected because over-ripe, spotted, bruised and for other reasons. The bill of lading also contained a recital of the receipt of the bananas in "apparent good order and condition."

Mr. Rider, appellants' agent, testified that he saw the discharge of a portion of the bananas in Los Angeles; that "the condition was ripe, turning, and apparently heated."; by "turning" is meant "the color is beginning to show, turning from green to yellow."; by "heated" is meant, "that the process of ripening has started, but has not possibly got so far as to show the damage and yellow color."; that not all of the bananas were that way, only a certain percentage of them were not salable as first class merchandise; such bananas were not decayed but had deteriorated, that is, "the fruit was not sound and merchantable." He further testified that no instructions had been given to the cutters on the plantation as to these particular bananas, but that there was a standing instruction as follows: "They shall be of good quality, which refers to scarring, etc., and they shall be of a grade and maturity which will not be too full to carry safely on a length of trip of eight days, or ten days, or twelve days."; that the proper state at which to cut the fruit would depend to a certain extent on the length of the voyage; that for a trip such as the "Heranger" engaged on from Balboa to San Pedro and San Francisco, bananas should be cut the shortest period possible before shipment. This witness said it would be difficult for him to say what would be a safe time "because it depends a great deal on the ship that you have to carry them forward, and other angles, but we will say 60 to 65 or possibly 70 hours would be safe, preferably a shorter time," depending "upon the condition of maturity of the bananas at the time they were cut."

The engineer on the "Heranger" testified they started loading the bananas in the morning and the log showed that the lower hold was closed at 7:45 in the evening; that the lower hold, where the bananas were stowed, had been pre-cooled to a temperature of 34 and 35 degrees the day before loading; that this could have no injurious effect on the fruit and was done to cool off the insulation outside the cargo room; that when the hatches were opened to receive the cargo the hold got warmer from the outside temperature.

According to the refrigeration log of the "Heranger," when the hatches were opened for loading at 8 o'clock on the morning of April 28th, the "in" and "out" temperatures in the hold registered 47 degrees and 50 degrees respectively, and when the hatches were closed at 7:45 p. m. that evening said temperatures read 62 degrees "in" and 70 degrees "out;" a delivery temperature of 52 degrees was reached at 12 a. m. and a return temperature of 56 degrees was reached at 8 p. m. the next day, April 29th.

The engineer further testified that under the existing circumstances on that hot day, and because of the bananas being warm, it was impossible to meet the instructions requiring ventilation and change of air and at the same time maintain delivery air at 52 degrees during loading, notwithstanding that the refrigerating machinery was operating "fine."

To show decreased operating efficiency of the vessel's refrigeration plant during loading W. W. Sandhold, a refrigeration expert called by appellants, testified that it was important to remove the heat from the incoming bananas in order to control ripening; that the log of the "Heranger" showed that the refrigeration compressors had been maintained at 362 revolutions per minute prior to loading, but during loading the compressors were reduced to 335 revolutions per minute; that the capacity of refrigeration is in direct ratio to the speed of the compressors, so that the greater the number of revolutions of the compressor the lower the temperature; that the effect of the reduction of revolutions would be to increase the temperature; that the reduction of 30 out of 362 revolutions per minute represents a reduction of 10% in the capacity of the plant; that the overall performance of the plant would be reduced 10%, roughly.

On the other hand, Edward L. Fuhrbery, a competent and experienced expert on refrigeration, who was familiar with the refrigerating apparatus and facilities of the "Heranger" and particularly with the No. 3 lower hold, and who had made a study and analysis of the refrigerating log of the vessel, gave testimony that the slowing up of the compressors from 362 to 335 revolutions per minute over a period of 12 hours while the fruit was being loaded in the hold would make no appreciable difference in the temperature of the hold. He further testified that a center loading ship, where the hatch is over the center of the hold, with a great area directly above the loading lower hold, could not maintain a 52 degree air temperature and circulate any quantity of air; that it would not be possible to maintain an intake temperature of 52 degrees during loading and circulate air; that it would be better to circulate air regardless of the intake temperature; that an intake temperature of 52 degrees could not be maintained with the hatches closed after the fruit was loaded because the heat of the cargo would have to be taken care of; that only when the heat was removed from the fruit would it be possible to reduce the temperature to 52 degrees; that it would have made no difference if the intake temperature of 52 degrees had been maintained during loading with the hatches open because the out-turn would have been poorer under the conditions that existed than it was; that there was more work done by the fan air circulation even though of a higher temperature.

This witness also testified that the refrigeration facilities as they existed at the time and the treatment given the shipment as indicated in the log would not contribute to damage from over-ripening or deterioration en route on a voyage such as here involved.

At the conclusion of the taking of testimony in this case it appeared that the deposition of a witness on behalf of appellees had been delayed in transmission and was not presented. Rather than delay determination of the case, the parties agreed that the trial be closed. In the brief for appellants reference is made to the absence of this deposition with an adverse inference for failure to produce it. On October 10, 1938, some time prior to the argument, appellees filed a motion in this court to have the deposition made a part of the record. Appellants objected and upon the agreement of appellants that no inference adverse to appellees would be drawn by reason of the absence of the deposition, this motion was denied.

The District Court, The Heranger, 20 F. Supp. 986, 988, in its opinion held that, "the condition of the fruit upon arrival at port of destination was attributable to its inherent defect or quality, rather than to wrongful acts of respondents. * * * As a contributing cause to ripening, the slight variations of temperature disclosed by the log were negligible when compared with the heat of the tropics prior to and on the day of load-

ing. * * *" A final decree in favor of appellees was entered from which the present appeal is taken.

Appellants' numerous assignments of error are presented in three arguments: (1) Appellees are liable for breach of the contract regarding refrigeration. The bananas were in good condition when delivered to the vessel and the damage was due to the vessel's failure to provide the refrigeration required by the agreement. (2) Appelles are liable for negligence in the care of the cargo. Appellees were under a duty to provide refrigeration as nearly approaching that required by the agreement as it was possible to provide. It failed to do so, without excuse, and was liable for damages from its failure. And (3) appellees are liable as for a deviation. The vessel, in failing to provide the refrigeration required by the agreement, was guilty of deviation. The deviation was voluntary because appellees knew, when they made the agreement, of the vessel's inability to perform.

The appellees, in addition to maintaining that the shipping agreement had been complied with, insist that the evidence shows that the damage to the fruit resulted from the condition in which it was when delivered to the ship and rely upon the Harter Act, which had been specially pleaded. Section 3 of the Harter Act, 46 U.S.C.A. § 192, provides in part as follows: "If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from * * * the inherent defect, quality, or vice of the thing carried, * * *."

The issue presented is, whether the damage to the fruit was caused by the failure of the vessel to give proper refrigeration on the day of loading and immediately thereafter in accordance with the agreement, or whether it was the result of inherent vice, that is, the tendency of the bananas to ripen.

Appellants admit that the ship was seaworthy; that they had no complaint as to the stowing of the bananas in the hold of the vessel; nor was there any objection to the refrigeration machinery of the ship, nor to the refrigeration temperatures maintained during the actual voyage. Their chief objection, as stated by counsel, "is to the care of the bananas at the time of loading and immediately thereafter with regard to the delivery of the temperatures which were required by contract to be maintained and which were not maintained."

Appellants argue that the instructions called for the delivery temperature to be maintained at 52 degrees during loading and thereafter until the return temperature be reduced to 56 degrees, this to be accomplished in about 20 hours after completion of the loading.

These objections and arguments are completely answered by the findings of the court below from which we quote:

"It was necessary to load said shipment of bananas through the open hatch of the Heranger on a hot and sultry day, and it was accordingly impossible to maintain an intake (delivery) temperature of 52 degrees while loading and still afford the bananas a proper circulation of air; that said above quoted instructions did not constitute complete instructions for the care of said bananas; that the engineers of the Heranger did not provide a delivery air temperature of 52 degrees during loading; that said performance by the Heranger, however, was reasonable, efficient, and afforded the said shipment of bananas proper care and refrigeration.

"That because of the warmth of the bananas at the time of loading, it was not possible to afford an intake temperature of 52 degrees immediately after loading and at the same time give a proper circulation of air to the bananas. That said delivery air temperature was reduced to 52 degrees approximately 18 hours after the loading ceased, and a proper circulation of air was at all times maintained. That said performance by the Heranger was reasonable, efficient, and afforded the said shipment of bananas proper care and refrigeration.

"That a return air temperature of 56 degrees was reached 24 hours after loading, which constituted a compliance with the instructions and which afforded reasonable, efficient and proper care and refrigeration of the said fruit.

"That the pre-cooling of the refrigerating compartment of the Heranger was in all respects properly carried out, and carried out in accordance with the libelants' instructions.

"That during the voyage of the Heranger, except as above mentioned, the said instructions of the libelants were in all respects complied with. That during loading and during the voyage, proper refrigeration, care and ventilation was afforded the said shipment of bananas at all times. That the variations from instructions hereinabove mentioned, and any other variations which may have existed, were necessary under existing conditions and in order to give proper ventilation, and were slight and inconsequential variations from the instructions and did not affect the condition of the said bananas upon discharge.

"That the alleged ripening, turning and heated condition of the bananas upon discharge was entirely due to the condition of the said bananas at the time of shipment; said fruit not being in a condition at the time of shipment to carry through the voyage without undergoing the changes complained of."

From a careful review of the record in this case we find that there is substantial evidence to support the findings of the trial judge. This court has adhered to the rule that findings and conclusions of the District Court in an admiralty case will be affirmed on appeal, unless the record discloses some plain error of fact or misapplication of some rule of law. The Mabel, 9 Cir., 61 F.2d 537.

Affirmed.

On Petition for Rehearing.

PER CURIAM.

Rehearing denied.

STEPHENS, Circuit Judge (dissenting).

I vote for granting the petition for rehearing in the above entitled cause, on the ground that I would like to hear re-argument on the matter of deviation.